## HYATT v. HUGHES.

### No. 11616.

Court of Civil Appeals of Texas.
San Antonio.

Oct. 30, 1946.

Rehearing Denied Nov. 27, 1946.

Walter Groce, Corpus Christi, J. B. Lewright, San Antonio, for appellant.

Boyle, Wheeler & Gresham, San Antonio, Green & Rosson, San Antonio, for appellee.

NORVELL, Justice.

Appellant, Leonard Hyatt, here complains of the trial court's action in rendering judgment against him under the provisions of Rule 301, Texas Rules of Civil Procedure.

Hyatt's action was one for damages for the breach of an oral contract. The jury found that appellee, "William E. Hughes, agreed on or before May 6, 1944, to execute and deliver to Leonard Hyatt, an assignment of a 49% interest in the General Agency Contract of May 6, 1944, after said General Agency Contract had been approved by the Board of Insurance Commissioners of the State of Texas." (Special Issue No. 1.)

Mercury Life & Health Company, a corporation, by the General Agency Contract, above mentioned, appointed William E. Hughes its general agent for a period of ten years. The jury found that the reasonable value of said General Agency Contract was $53,000. (Special Issue No. 2.) Upon proper motion, the trial court disregarded the jury's answers to Special Issues

Nos. 1 and 2, and rendered judgment for Hughes. Hyatt contends that the judgment should have been rendered for him on the findings of the jury in the amount of $25,970, 49% of $53,000.

Hyatt's petition asserted two separate causes of action. The jury found against Hyatt upon one of these, and only the cause of action based upon an alleged breach of contract is involved in this appeal.

After an examination of the evidence, we have come to the firm conclusion that the trial court rendered the only judgment which could have properly been rendered, i. e., that Hyatt take nothing by reason of his asserted cause of action for breach of contract.

We are of the opinion that the evidence and the jury's finding upon Special Issue No. 1, fail to establish a contract which is sufficiently complete, definite and certain so that legal liability may be predicated upon a breach thereof.

By way of an alternative, we express the further opinion that if it be considered that Hughes did breach a legally sufficient contract, then there is no evidence in the record which supports a proper measure of damages. A proper measure of damages was not submitted by Special Issue No. 2.

The record in this case is voluminous and the briefs are lengthy. In view of the holdings above indicated, many of the contentions presented by the parties are beside the point. In order to keep this opinion within reasonable bounds, we shall confine our discussion to the matters indicated, as they effectively dispose of appellant's contention that reversible error was committed by the trial court.

The essential facts of the case are as follows:

The Mercury Life & Health Company is a mutual assessment company, organized under the provisions of Chapter 111 Acts, 28th Legislature (1903) p. 174. The provisions of this Act were included in the 1925 Revision of the Texas Civil Statutes as Articles 4784–4799 thereof. In 1929 this law was repealed by the 41st Legislature. Act 1929, 1st C.S., p. 90, Ch. 40, § 18, as amended by Acts 1929, 2d C.S., p. 99, Ch. 60, § 1. The repealing act, however, contained a saving clause which provided that said repeal should not "apply to or affect any Company or Association of this State now doing business under the laws repealed, and they shall continue to be governed by the regulatory provisions of such laws." Article 4860a—18, Vernon's Ann. Civ.Stats. In 1939, the 46th Legislature passed an Act which is applicable to mutual assessment companies, such as the Mercury Lift & Health Company. Acts 1939, 46th Leg., p. 401, Article 5068—1, §§ 1—35, Vernon's Ann.Civ.Stats.

The evidence indicates that because of the repeal of the 1903 law, the charters of the companies coming within the saving clause of the repealing act possess considerable value. Evidently persons interested in the mutual assessment business bought and sold these charters as if they were merchandise or articles of commerce.

It is stated in appellant's brief that, "in March, 1942, Leonard Hyatt bought from Charles A. McCormick of Austin, 'the charter' of Mercury Life & Health Company."

On the thirtieth day of November, 1943, the appellant, Hyatt, and appellee, William E. Hughes, entered into a written agreement under the terms of which, for a consideration of $12,500, Hyatt sold to Hughes "51% of all my right, title and interest, of every kind and character whatsoever, in and to that insurance company and/or association, designated and named Mercury Life & Health Company, * * *."

Paragraphs 3 and 4 of this agreement read as follows:

"It is my intention, and I hereby do so, to convey and sell and bargain and assign and transfer unto the said William E. Hughes fifty-one per cent of the said company known as Mercury Life and Health Company, together with its charter and all assets and rights and privileges of every kind and character, and good will, interest in all contracts of every kind and character, and insurance policies of every kind and character, and also all assets of every kind and character, and all rights and privileges of every kind and character wherever same may be located and situated

so that he shall own said fifty-one per cent of said Mercury Life and Health Company wherever it may do business and under any and all conditions and situations that might exist, so that he shall own in fee simple, unconditionally, fifty-one per cent of the said Mercury Life and Health Company.

"It is agreed and understood that the said William E. Hughes, being the owner of fifty-one per cent interest in the said insurance company, has the right and privilege of naming three of a Board of Directors to be composed of five, and that the remaining interest of said insurance company, same being forty-nine (49%) per cent owned by the said Leonard Hyatt, has the right and privilege of naming two of said Board of Directors so that the said William E. Hughes shall at all times as long as said insurance company exists have the right to name and designate and elect three of said Board of Directors composed of five members, and the other forty-nine per cent interest to have the right to elect, designate and name two of said Directors." The agreement further named three directors as Hughes' appointees and two others as appointees of Hyatt, and provided that Hughes should serve as Chairman of the Board of Directors, and that Hyatt should serve as President of the Company. Hyatt's salary was fixed by the agreement at $400 per month.

We pause here to point out that from a legal standpoint the contracts mentioned are somewhat unrealistic. The Mercury, as we shall hereinafter designate the Company, was a corporation formed under a specific law of the State of Texas, which provided that:

"Such corporations shall issue no certificate of stock, shall declare no dividends, shall pay no profits; and the salaries of all officers shall be designated in its by-laws. Such by-laws shall provide for annual members' meetings, in which each member shall be entitled to vote, only in person, the amount of insurance, held." Art. 4789, 1925 Revised Civil Stats.

Obviously, control of the corporation was vested in those persons holding its certificates or policies of insurance.

Neither McCormick nor Hyatt ever "owned" the Mercury or its charter. In order for the contract between Hyatt and Hughes to make legal sense at all, it must be considered as implicit in the agreement that the contracting parties would influence those in whom control of the corporation was vested by law, to so act as to bring about the results contemplated by the contracting parties.

For some time Hyatt and Hughes, as officers of the Company, together with the persons named as directors in their contract, and evidently elected to such positions by the policy holders of the corporation, conducted the business of the Company. The relations between Hyatt and Hughes were apparently friendly and harmonious.

The 1939 Act, relating to Mutual Assessment Companies, Article 5068—1, Vernon's Ann.Civ.Stats., provides that assessments collected from members shall be divided into two funds, one of which shall be a mortuary and relief fund and the other an expense fund. Sixty per cent of each assessment must be deposited in the mortuary or relief fund. Out of this fund claims upon certificates may be paid, and to a limited extent the cost of defending contested claims and nothing else.

Expenses of operation and solicitation of new members may be paid out of the expense fund in which forty per cent of all assessments collected are deposited. Article 5068—1, § 12.

Also, by the 1939 Act the operations of mutual assessment companies were placed largely under the supervision of the Board of Insurance Commissioners of the State of Texas, Article 5068—1, and said Board may order the removal of any officer, employee, or director of such companies found unworthy of trust.

On May 6, 1944, the Mercury Company entered into a General Agency Contract with William E. Hughes. This contract was in writing and Hughes was given the exclusive right and privilege of selling and disposing of all insurance policies to be issued by the Company for a ten-year period. Hughes agreed to supervise all advertising of the Company and approve all

expenditures therefor, appoint and supervise sub-agents of the Company and "to manage and conduct said Company's agency business in an efficient and proper manner."

The paragraph of the contract relating to Hughes' compensation reads as follows:

"5. The Company shall, after making proper deductions from all income from its business to the reserve for claims in the proportion determined by law, and after paying all expenses necessary to the proper and usual operations of its business, including taxes, save and except, however, salaries of officers of the Company, pay all surplus funds then remaining to the Agent as compensation to said Agent and for the purposes herein specified."

As to assignment, the contract provided:

7. It is mutually understood and agreed that this contract may be sold, assigned and transferred by said Agent provided the person or firm to which such sale and assignment may be made is or are competent and that he or they assume all of the obligations and liabilities imposed, upon said Agent by the terms of this contract and with the understanding that such sale and assignment be approved by the Board of Directors of the Company at a regular or special meeting. This contract may be cancelled with the mutual consent of all parties interested herein."

This General Agency Contract was approved by the Board of Insurance Commissioners.

It appears that Hughes and the Board of Directors of the Company did not place Hyatt's name in the contract for fear it would be rejected by the Board of Insurance Commissioners. It appears that Hyatt, prior to the date of said contract had engaged in a controversy with the Board of Insurance Commissioners over a report as to the condition of the Mercury Company made by one of the Board's examiners. Hyatt was later removed as President of the Company by reason of an order of the Board. Hyatt and Hughes became involved in a controversy over the affairs of the Company and no assignment

of a 49% interest in the General Agency Contract was ever executed.

The testimony relating to the disputed oral agreement to execute an assignment was no broader than the jury's finding. Hyatt simply testified that Hughes had orally agreed to assign to him a 49% interest in the General Agency Contract.

We have heretofore described and quoted from the General Agency Contract so that its nature is readily apparent. It is a contract for personal services to be rendered by the agent, Hughes, to the principal, the Mercury Company. Its practical effect is to turn over to Hughes all the Company's business of selling insurance policies and procuring new business, and place Hughes under the obligation of conducting this portion of the Company's business in an efficient and proper manner.

The rights which Hughes acquired under this contract were obviously not similar to those incident to the ownership of a chattel or an ordinary article of merchandise. An assignment of a 49% interest in certain species of property may be certain and definite, but what is the effect of the assignment of a 49% interest in a personal service contract such as is involved here?

■ An agreement to execute an assignment to a 49% interest in the contract can not be construed as an agreement to make both Hyatt and Hughes agents of the Mercury Company. The Mercury is not a party to this suit and the principal contract expressly provides that assignments thereof must be approved by the Board of Directors of the Company. Further, the Board of Insurance Commissioners has the power to require that General Agency Contracts be approved by it. Evidently it did require that the principal contract involved here be submitted to it for approval. There is no indication that either the Board of Directors of the Mercury or the Board of Insurance Commissioners would approve a contract whereby both Hyatt and Hughes would be appointed general agents.

The agreement to assign could hardly be construed as an employment contract, under which Hughes would be the employer

and Hyatt the employee. Whatever the relationship between appellant and appellee would be, in the event the assignment were executed, the duties and obligations of Hyatt under such agreement are obscure. Would he be required to devote his time and efforts to assisting in the operation of the general agency business of the Mercury Company? Or would he be entitled to collect 49% of the money paid to Hughes under the contract without performing any services whatsoever?

The answers to these questions are not disclosed by the record and we conclude that the contract to assign, being wholly executory, comes under the rule that precludes the fixing of liability for damages by reason of a breach of an agreement so incomplete and uncertain in its terms as to make it unenforcible. Moore v. Dilworth, 142 Tex. 538, 179 S.W.2d 940; Barrier v. Brinkmann, 130 Tex. 350, 109 S.W.2d 462; Haskell Motor Company v. Remington, Tex.Civ.App., 25 S.W.2d 913; 12 Am.Jur. 554, § 64; 10 Tex.Jur. 175, § 101.

If we disregard all statutory enactments relating to mutual assessment companies such as the Mercury, and the actions of the Board of Insurance Commissioners taken with reference to the Company, and assume that the insurance business involved here was owned by Hughes and Hyatt as partners or joint adventurers and that the corporate charter and the General Agency Contract were mere trade devices under which the partners operated, no evidence as to a proper measure of damages resulting from the breach of contract sued upon is disclosed by the record.

Two witnesses gave estimates of the value of a General Agency Contract, as if such contracts were a species of property sold and transferred from one person to another like a share of corporate stock or a negotiable bond. According to these witnesses, the value of the contract was determined by a formula which included the value of the "charter" of the corporate insurance company, and took into consideration the monthly assessment income of the company. As one witness put it, the General Agency Contract which Hughes had procured from the Mercury "is reasonably worth six times your average monthly premium income plus a fair market value of your charter." He further testified that "there is a cash market for that charter of $7,500," because such charters are difficult to obtain, and that the only way one can acquire such a charter is "to find one for sale." He estimated the average monthly income of Mercury at $8,000 per month, six times said amount being $48,000; and he placed a value of $7,500 on the charter.

The witness upon these bases estimated that the General Agency Contract had a value of $55,500. In accordance with this testimony and other evidence similar thereto, the jury found that the General Agency Contract had a value of $53,000.

We think it clear that the evidence above outlined did not afford a proper basis for measuring damages occasioned by the breach of a partnership agreement. 32 Tex.Jur. 492, § 172.

If we construe the agreement to assign an interest in the General Agency Contract as an understanding between Hughes and Hyatt that they would henceforth conduct the Mercury's business in a sort of dual capacity as "owners" of the business and as agents therefor, in some respects similar to the way they had operated the business as officers of the corporation, the agreement would nevertheless be a contract calling for the rendition of personal services. The evidence does not afford a basis for measuring damages resulting from the breach of a contract of employment in accordance with applicable legal standards.

13 Tex.Jur. 109, § 34, 29 Tex.Jur. 35, § 19; Wallace v. American Life Ins. Co., 111 Or. 510, 225 P. 192, 227 P. 465.

Appellee says that the agreement sued upon is within the statute of frauds. We have held that said agreement is not sufficiently complete, definite and certain to be enforcible in law. For a substantial issue relating to the application of the statute of frauds to be presented, it is

necessary that a contract otherwise legally enforcible be shown. For this reason, we pretermit discussion of appellee's contention. What we have said disposes of the case. The judgment of the trial court is affirmed.