**Tom I. McFARLING, Receiver, et al., Appellants,**

v.

**John LAPHAM et al., Appellees.**

**No. 7412.**

Court of Civil Appeals of Texas, Beaumont.

Dec. 14, 1972.

Rehearing Denied Jan. 11, 1973.

House, Mercer, House & Brock, San Antonio, A. M. LeCroix, Austin, Wyckoff, Eikenburg, Russell & Dunn, Houston, for appellants.

Clemens, Weiss, Spencer & Welmaker, Groce, Locke & Hebdon, Lang, Cross, Ladon, Boldrick & Green, Kampmann, Church & Burns, Oliver & Oliver, San Antonio, for appellees.

KEITH, Justice.

Plaintiff below appeals from a summary judgment entered in favor of numerous defendants. Because of the involved nature of the plaintiff's claim and the several defenses urged by the different defendants, an extensive statement of the case is required.

Appellant is the court appointed receiver of Mercury Life & Health Company (hereinafter "Mercury"), United Security Assurance Company (hereinafter "United"), and Reserve Investment Credit Corporation (hereinafter "Rico"). He sought to recover more than $290,000, plus interest and exemplary damages from several defendants who are grouped in our opening discussion. Basically, plaintiff alleged that through the acts and omissions which he charged against the several defendants in his pleadings, Mercury and United had been looted of their liquid assets and forced into receivership. Plaintiff sought recovery of funds of the insurance companies alleged to have been appropriated to the use and benefit of certain of the defendants through the aid and assistance of other defendants.

### 1. Background

It appears to be undisputed in the record that for several years before May 1, 1968, Mercury and United were engaged in conducting the insurance business in Texas, each being a mutual assessment company organized under Chapters 13 and 14 of the Insurance Code, V.A.T.S. Before his death in 1967, both companies were under the actual control of Leonard Hyatt.[1] This control was exercised through Rico which had a management contract with each company. Rico had outstanding 100 shares of stock, 40 of which were held by Hyatt personally, 15 by each of Hyatt's two daughters and a granddaughter, while the other 15 shares were held by John Peace, Hyatt's attorney. Upon Hyatt's death, his son-in-law, John Lapham, qualified as independent executor and trustee of Hyatt's estate. Lapham then assumed the management of the two companies through Rico.

According to plaintiff's pleadings, each of the insurance companies was solvent

---

1. Some of Hyatt's earlier dealings with the two insurance companies are recounted in the following series of opinions: Hyatt v. Mercury Life & Health Co., 202 S.W.2d 320 (Tex.Civ.App., San Antonio, 1947, error ref. n. r. e.) ; Hyatt v. Hughes, 221 S.W.2d 998 (Tex.Civ.App., San Antonio, 1946, no writ) ; Hughes v. Sanders, 243 S.W.2d 211 (Tex.Civ.App., San Antonio, 1951, no writ) ; Mercury Life & Health Company v. Hughes, 271 S.W. 2d 842 (Tex.Civ.App., San Antonio, 1954, error ref.).

and in good standing at all times prior to May 2, 1968. Defendants made no effort to disprove this allegation which was supported by the receiver's affidavit in opposition to the motions for summary judgment.

On May 2, 1968, all of the shares of stock in Rico were sold to the defendant Cartsonas in the series of maneuvers to be set out later, the control of the two insurance companies transferred to Cartsonas, and their liquid assets were effectively dissipated soon thereafter.

### 2. The Events of May 2, 1968

We recount, in severely truncated form, some of the salient events which occurred on the significant date when Cartsonas acquired control of Rico and, through it, of Mercury and United.

Shortly before the critical date, an agreement had been reached between Lapham, representing the owners of the stock in Rico, and Cartsonas, whereby all of the stock in Rico would be sold to Cartsonas for $210,000 in cash. It was agreed in the written contract that all the various officers and directors of the three corporations would resign to be succeeded by nominees of Cartsonas. At that time, the two insurance companies had on deposit in Brooks Field National Bank[2] more than $275,000 in cash and had certain bearer bonds in a safe deposit vault, such being a part of the mortuary fund of the companies.

On the morning of May 2, Cartsonas talked with defendant Walters, an officer of Frost National Bank, concerning the transfer of funds of the several companies to the First National Bank of Alvin. He was advised that before Frost could transfer the funds it must first have "good" money at its disposal. It appears that what Walters meant was unrestricted funds to the credit of Frost in the Federal Reserve Bank in San Antonio. Walters had a telephone conversation with defendant Gillen, an officer of the Alvin Bank, concerning the transfer of certain other funds from the Alvin Bank to Frost Bank.

Next, Lapham, Cartsonas, one of Cartsonas' associates (the defendant Bush), and an employee of the three involved companies appeared at the Brooks Bank. There, an officer of Brooks Bank accepted new signature cards upon the accounts of Mercury and United authorizing Cartsonas to sign checks upon the accounts of the two companies. Bush, thereupon, issued two checks, one for $195,000 upon Mercury's account in Brooks Bank and another for $80,000 drawn upon United's account in that bank. Each check was made payable to the drawing company and was endorsed restrictively for deposit to the account of such company in the Frost Bank.

Neither check ever left the bank; instead, Vice President McCaskill of Brooks Bank debited each check against the account of the respective drawer companies. He then transferred $275,000 to the Frost Bank, not directly, but indirectly. He caused National Bank of Commerce of San Antonio to transfer $275,000 of Brooks Bank's funds to Frost Bank through the branch bank of the Federal Reserve System in San Antonio. The deposit to Frost Bank was unrestricted, a fact that Walters at Frost soon learned.

Walters at Frost then telephoned Gillen at the Alvin Bank, advising that Frost Bank had $275,000 on deposit to the credit of the two insurance companies. Thereupon, Gillen at the Alvin Bank instructed the First City National Bank in Houston to transfer $210,000 to the credit of Frost Bank through the Federal Reserve Bank in San Antonio.[3] This was done, apparently almost instantly, and at that time Frost

---

2. Hereafter, we will refer to the several defendant banks only by the distinguishing name in their respective corporate titles.

3. Plaintiff emphasizes that Alvin Bank's loan limit to any customer was only $70,000 and that Gillen had purchased $200,000 in "federal funds" for use one day only, May 2, 1968.

Bank had in its effective possession $485,000 in "good money".

Walters, acting for Frost Bank, then disbursed $210,000 to the stockholders of Rico by issuing its checks to the several individuals. It then sent $275,000 to the Alvin Bank to the credit of the two insurance companies, sending the funds through the First City National Bank in Houston. Thus, in something approximating one hour, Frost came into possession of $485,000 and disbursed the entire sum.

Apparently by the time the $275,000 reached Houston, the Federal Reserve System had closed for the day. Nevertheless, notwithstanding the fact that Alvin Bank did not receive this credit to the two insurance companies until the next day, it reimbursed itself for $210,000 from the insurance companies' funds. Later, an additional $40,000 of the same funds was credited upon Cartsonas' indebtedness to the Alvin Bank.

### 3. *Pleadings of the Parties*

Plaintiff named as defendants, in addition to Cartsonas and Bush (neither of whom were served, deposed, answered, or appeared), the following: (a) Brooks Bank and its officer McCaskill; (b) Frost Bank and its officer Walters; (c) Alvin Bank and its officer Gillen; (d) Lapham and the other stockholders in Rico.

Broad allegations of conspiracy negligence, breach of fiduciary duties, unjust enrichment, etc., were alleged against the several defendants. None of the defendants challenged the pleadings by special exceptions and the trial pleading of the plaintiff takes up more than sixty pages in our transcript in addition to exhibits attached thereto.

Defendants answered generally, denied the agency of one Langham, Lapham's attorney who prepared the contract between Cartsonas and Rico, and the several banks sought indemnity or contribution against all other defendants.

### 4. *The Summary Judgment*

Extensive depositions were taken (and sent up in original form for our consideration) of the leading participants in the transaction.

Each of the appellees filed a motion for summary judgment supported by affidavit and incorporating the depositions on file. Plaintiff filed his affidavit in opposition to the motions for summary judgment, basing his "facts" upon his interpretation of the contents of the depositions of the several defendants.

The trial court sustained the defendants' motions as to the plaintiff's cause of action against each of the moving defendants and entered a take nothing judgment as to them. Later, an order of severance was granted as to the remaining causes of action asserted by the plaintiff. The receiver has appealed. Alvin Bank, although it did not file a motion for summary judgment, also filed an appeal bond and aligns itself with plaintiff, at least insofar as a reversal of the summary judgment is concerned. No disposition was made in the summary judgment, or in the order of severance, of the several third party actions for indemnity and contribution.

Incredibly, plaintiff assails the judgment with forty-nine points of error. Alvin Bank, accepting the teachings of Malooly Brothers, Inc. v. Napier, 461 S.W.2d 119, 121 (Tex.1970), comes forward with the single point suggested by Justice McGee.

### 5. *The Alvin Bank Appeal*

Upon the day of submission of this cause, and immediately before oral argument, the several appellees filed for the first time their motions to dismiss the appeal of the Alvin Bank. We carried the motions with the case and permitted Alvin Bank to participate in the oral argument, it having otherwise complied with the briefing rules. From our earlier statement of the case, it is clear that Alvin Bank is not an aggrieved party to the judgment entered

in the court below. It had not sought a summary judgment nor did the judgment which was entered fix liability upon it nor deny to it any affirmative relief which it sought. Insofar as it had pleaded causes of action for indemnity or contribution, such remained viable issues in the severed cause.

■ It is fundamental that one may not complain of errors in a judgment which do not affect him injuriously or which merely affect the rights of others. Shell Petroleum Corporation v. Grays, 131 Tex. 515, 114 S.W.2d 869, 870 (1938). The right of appeal rests only in an aggrieved party to a lawsuit. Texas Employers Ins. Ass'n v. Howell, 107 S.W.2d 391, 392 (Tex.Civ. App., Dallas, 1937, error dism.). Alvin Bank, not being aggrieved by the judgment below, is not entitled to assert error in the judgment from which it has attempted to appeal. The appeal of Alvin Bank is dismissed. See Phelan v. Phelan, 471 S.W.2d 605, 609 (Tex.Civ.App., Beaumont, 1971, no writ), and cases therein cited.

## Opinion

■ The moving parties below assumed an onerous burden when they sought the summary judgment. Plaintiff had presented several theories seeking to impose liability upon the defendants and, of course, had the duty of presenting sufficient facts upon the conventional trial to establish his right to a recovery. However, upon the hearing of the motions for the summary judgment, the moving parties labored under the burden of establishing, as a matter of law, that there was no genuine issue of fact. This rule is now firmly established in Texas, one of the leading cases being Gibbs v. General Motors Corporation, 450

S.W.2d 827, 828 (Tex.1970),[4] where it was said:

"[T]he question on appeal, as well as in the trial court, is *not* whether the summary judgment proof *raises fact issues* with reference to the essential elements of a plaintiff's claim or cause of action, but is whether the summary judgment proof *establishes as a matter of law that there is no genuine issue of fact* as to one or more of the essential elements of the plaintiff's cause of action.

\*       \*       \*       \*       \*       \*

"[T]he [summary] judgment sought should be granted, and if granted should be affirmed, *only* if the summary judgment record establishes a right thereto as a matter of law." (emphasis by Chief Justice Calvert)

Our new Chief Justice spelled out in detail some of the rules governing the summary judgment practice in Great American R. Ins. Co. v. San Antonio Pl. Sup. Co., 391 S.W.2d 41, 47 (Tex.1965), from which this series of quotations is taken:

"Rule 166–A, Texas Rules of Civil Procedure, provides that summary judgment shall be rendered if it is shown that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

[a] "The burden of proof is on the movant, and all doubts as to the existence of a genuine issue as to a material fact are resolved against him. . . .

[b] "[T]he evidence must be viewed in the light most favorable to the party opposing the motion. . . .

[c] "If the motion involves the credibility of affiants or deponents, or the

---

4. Accord: Glenn v. Prestegord, 456 S.W. 2d 901 (Tex.1970); Harrington v. Young Men's Christian Ass'n of Houston, 452 S.W.2d 423 (Tex.1970); Prestegord v. Glenn, 441 S.W.2d 185 (Tex.1969); Torres v. Western Casualty and Surety Company, 457 S.W.2d 50 (Tex.1970); Abbott Laboratories v. Gravis, 470 S.W. 2d 639 (Tex.1971); Guidry v. Neches Butane Products Company, 476 S.W.2d 666 (Tex.1972); Lokey v. Texas Methodist Foundation, 479 S.W.2d 260 (Tex. 1972).

weight of the showings or a mere ground of inference, the motion should not be granted.

[d] "All conflicts in the evidence are disregarded, and the evidence which tends to support the position of the party opposing the motion is accepted as true. . . .

[e] "Evidence which favors the movant's position is not considered unless it is uncontradicted.

[f] "If such uncontradicted evidence is from an interested witness, it cannot be considered as doing more than raising an issue of fact, *unless* it is clear, direct and positive *and* there are no circumstances in evidence tending to discredit or impeach such testimony. . . . [emphasis added]

[g] "This exception [Subdiv. (f), supra] is especially true where the opposite party has the means and opportunity of disproving the testimony, if it is not true, and fails to do so.

[h] "After all the evidence has been sifted in this manner, the Court must determine whether the movant is entitled to a judgment as a matter of law."

■ The appellees here argue at great length that the plaintiff below failed to offer sufficient factual proof of his allegations against them; and, for the purpose of this appeal, in the posture in which the case reaches us, we concede that such proof is weak. But, as was said in Tigner v. First Nat. Bank of Angleton, 153 Tex. 69, 264 S.W.2d 85, 87 (1954) : "The failure of one party in a hearing upon a motion for summary judgment to discharge the burden which would rest on him at a trial on the merits is no ground for a summary judgment in favor of the other party."

With these principles governing our review of this case firmly established, we turn now to a consideration of the authorities cited by the appellees in support of the action of the trial court.

Several of the appellees cite and rely heavily upon language found in Schlumberger Well Sur. Corp. v. Nortex Oil & G. Corp., 435 S.W.2d 854 (Tex.1968), wherein the rules governing conspiracy are set out with great clarity. We accept the teachings of this case without hesitancy; but, *Schlumberger* came to the Supreme Court in a different posture than does the case at bar. In *Schlumberger,* there was a conventional trial and at the conclusion of Nortex' evidence, the trial judge withdrew the case from the jury and rendered judgment that Nortex take nothing.

■ The standards for appellate review of a summary judgment and a judgment resting upon a peremptory instruction are entirely different. This fact is illustrated when we consider the two *Glenn Cases.* In Prestegord v. Glenn, 441 S.W.2d 185 (Tex.1969), the summary judgment in favor of Dr. Glenn was reversed because the Supreme Court was not convinced that he had made a conclusive showing that he was not negligent. Proximate causation was not involved.

Upon the second appeal, Glenn v. Prestegord, 456 S.W.2d 901 (Tex.1970), the trial court granted Dr. Glenn's motion for peremptory instruction. The plaintiff had failed to prove causation and thus the peremptory instruction was upheld. Justice Reavley, in the second *Glenn Case,* explained the result reached in this manner:

"The difference appears when we turn to proximate cause. The record in each appeal is silent on that matter. This was no problem to the plaintiffs on defendant's motion for summary judgment. *Plaintiffs were not required to prove causation to oppose that motion.* If defendant failed to negate causation, to that extent he did not sustain his own burden. However, to hold defendant liable, plaintiffs upon [conventional] trial had the burden of proving his negligence

and its causal connection with the injuries. The motion for directed verdict tested the plaintiffs' performance as to that burden. The record being silent as to causal connection or—to put it esoterically—there being no evidence of proximate cause, the plaintiffs have failed and must suffer the judgment which was rendered." (456 S.W.2d at 903, emphasis added)

■ So it is with the defendants in their reliance upon the teachings of *Schlumberger*. It was not plaintiff's obligation to produce *any* proof of conspiracy at the summary judgment stage. Instead, it was incumbent upon the moving defendants to establish conclusively and as a matter of law the nonexistence of a conspiracy.

One of the authorities cited in *Schlumberger* was Jernigan v. Wainer, 12 Tex. 189, 193 (1854), wherein the court said:

"Frauds of the character of that disclosed by the record can seldom be proved by direct and positive evidence. When men enter into conspiracies, they are not likely to call in a witness. They resolve their schemes clandestinely and in secret. Their purpose is imposition and deception; and secrecy is necessary to its accomplishment. In such cases the injured party must necessarily have recourse to circumstantial evidence. For it is only by the inferences and deductions which men properly and naturally draw from the acts of others in such cases, that their intentions can be ascertained. They are not likely to proclaim them in the hearing of witnesses."

Each of the several groups of appellees (each bank and its defendant-officer, and the Lapham group of stockholders in Rico) contends that its particular group did not participate in a conspiracy although no one denies the fact that the concerted activity of all of the defendants brought about the complete loss of all of the mortuary funds of the two insurance companies.

Since this cause must be tried upon its merits, it would be inappropriate, and possibly harmful to the parties, for us to recount in detail the evidence contained in the mass of depositions. The Lapham group of shareholders in Rico came into possession of $210,000 under circumstances which would have put a reasonably prudent person on notice that the money which they received individually was money constituting a trust fund for the protection of the policyholders in the two insurance companies.

All of the Lapham group came into possession of their stock in Rico because of the personal relationship which they bore to the deceased, Hyatt. Mr. Peace was an attorney involved in one or more of the cases involving these companies noted in footnote 1, supra. It challenges credulity to say that these individuals would accept thousands of dollars for their shares in Rico under the circumstances shown by this record in an honest belief that Rico had anything other than nominal assets.

The affidavits filed by the several stockholders in Rico, other than Lapham, were obviously based upon the language found in Maxey v. Rodman, 444 S.W.2d 353, 355 (Tex.Civ.App., El Paso, 1969, error ref. n. r. e.), followed in Maxey v. Irish, 457 S. W.2d 87, 89 (Tex.Civ.App., Eastland, 1970, no writ). In the *Rodman Case,* it was held that the unchallenged affidavits of the several defendants entitled them to the summary judgment.

In the case at bar, there is an intervening agency not present in either of the *Maxey Cases* just noted. James B. Langham was an attorney associated with John Peace in the practice of law. Langham had done professional work for the three companies during Hyatt's lifetime; he had represented Lapham in the Hyatt probate proceedings; and, he was in all of the negotiations to sell the three companies. He prepared the contract of sale; he prepared the minutes of the meetings wherein the corporate officers successively resigned to

be succeeded by nominees of Cartsonas. As a matter of fact, Langham testified that when he first learned of Cartsonas' interest in acquiring Mercury and United, he told Cartsonas "how it would be handled, and I told him that *we* would sell him the stock in RICO."

Langham was present at the meeting at the Frost Bank when the several transactions were handled through the Federal Reserve System. It was he who told Walters the names of payees and amounts of the cashier's checks to be made to the several stockholders of Rico. Langham actually took possession of these checks, procured the stock certificates from at least two of the stockholders, and delivered them to Bush. He represented the several companies after the May 2 sale of the stock to Rico. His activities in this case permeate the entire record. There was no similar evidence in the record, insofar as we can determine, in the *Maxey Cases* mentioned earlier.

■ We do not impute to Langham, nor to the stockholders in Rico, any improper or illegal motive or action in the transactions made the basis of plaintiff's suit. We simply hold that under the circumstances shown by the record in this cause, the Lapham group of stockholders in Rico have failed to discharge "the heavy, and in a case of this character virtually impossible, burden of establishing as a matter of law at the summary judgment stage that [they are] not liable under any theory fairly presented by the allegations of the petition." Kelsey-Seybold Clinic v. Maclay, 466 S.W.2d 716, 720 (Tex.1971).

Insofar as our record shows, Frost Bank was acting simply as a conduit in the transfer of the mortuary funds of Mercury and United from the Brooks Bank into the pocket of Cartsonas. Walters, at the very time the transfer was being accomplished, remarked that it looked to him as if they were just "swapping dollars." Granted that Walters testified that he had no knowledge of Cartsonas' returned check of $210,000 which was in the Frost Bank at the very instant he was engaged in the maneuvers, nevertheless, he learned of it before Cartsonas had left the bank that afternoon. He took no steps, either before or after learning of such fact, to protect the mortuary funds of Mercury or United.

■ His continued insistence upon "good money" being available in this unusual transaction (it was his first such experience) is but one circumstance which might be considered by a jury in weighing his testimony. He was an interested witness, being sued personally as well as an agent of Frost Bank. As appellant points out in his brief, there are inconsistencies in his testimony when that of the other parties is considered. Under these circumstances, we are of the opinion that Walters' testimony "cannot be considered as doing more than raising an issue of fact," and was not sufficient to establish non-liability as a matter of law. Great American R. Ins. Co. v. San Antonio Pl. Sup. Co., supra (391 S.W.2d at 47); Torres v. Western Casualty & Surety Co., supra footnote 4; Swilley v. Hughes, 488 S.W.2d 64 (Tex.1972).

A somewhat different situation is encountered when we come to consider the participation of Brooks Bank and McCaskill in the transaction. When Lapham, Cartsonas, Bush, and Hernandez appeared at the bank to withdraw the funds of Mercury and United, they had every indicia of control of the two accounts in the Brooks Bank. Lapham's presence lent credibility to the corporate minutes which were presented to the Brooks Bank. According to these records, prepared by Langham, Bush and Hernandez were authorized to withdraw all of the funds of Mercury and United from the bank. They executed new signature cards in routine fashion and proceeded to draw checks upon the accounts. They could have withdrawn the entire balance in each account in cash, because there was no restriction on such act.

But, Bush and Cartsonas did not withdraw cash from the Brooks Bank, one reason being that the bank did not have that much cash on the premises. Instead, acting upon the very proper suggestion of DeLeon of the Brooks Bank, each of the checks was endorsed restrictively to Frost Bank. It was at this point that Brooks Bank deviated from the course of action dictated to a prudent banker. Had the checks taken their normal course through banking channels, such checks would have been credited to the accounts of the two insurance companies in the Frost Bank. Signature cards, corporate minutes, and other indicia of agency would have been required by Frost Bank of anyone dealing with such funds.

These checks never left the premises of Brooks Bank except to go to the National Bank of Commerce for posting to the accounts of the companies in Brooks Bank since Brooks Bank used the computer facilities of National Bank of Commerce. Under normal procedures, it would have taken, according to McCaskill, a minimum of three days' time to transfer the funds to Frost Bank. It appears that the device created by Cartsonas required the entire transaction to be accomplished in one day.

Walters testified that had the two checks been presented to Frost Bank with the restricted endorsements, he would *not* have transferred the funds to the Alvin Bank upon the verbal instructions of a man who just walked in off the street, Cartsonas. He would have required corporate resolutions, etc., before making any disposition of the proceeds of the two checks. Instead, when the funds were deposited in the Federal Reserve Bank to the account of Frost Bank in an unrestricted form— "good money"—he was willing to enter into the transactions, as he put it, because Mr. Lapham "was involved in it and [his

father] was a former director of the Frost National Bank."

In Fultz v. First National Bank in Graham, 388 S.W.2d 405, 407 (Tex.1965), the court said: "The instruction carried in the restricted endorsement, 'For Deposit Only,' if followed, afforded absolute protection to both the bank and the depositor in the check deposit transactions and would have rendered the misappropriations impossible." In this case, had the Brooks Bank followed the instructions contained in the restrictive endorsements, it would have been insulated from liability under the rationale of *Fultz*. It is also clear from the testimony of Walters that, had such instructions been followed by Brooks, the funds would not have been transferred to the Alvin Bank upon the verbal instructions of Cartsonas.

■ Thus, there is an issue of fact presented as to whether Brooks Bank, acting through McCaskill, failed to use ordinary care in the transfer of the funds. Having deviated from the instructions shown upon the very checks themselves, it set in motion the series of events which led to the bankruptcy of the two companies. It is unnecessary at this time to determine the legal theory upon which plaintiff may rest his case against Brooks Bank. It is sufficient to say that Brooks Bank has not discharged the onerous burden it assumed when it moved for the summary judgment. It was charged with negligence and, as was said in Adam Dante Corporation v. Sharpe, 483 S.W.2d 452, 456 (Tex.1972): "Whether conduct is reasonable is ordinarily a question of fact."

But, Brooks Bank asserts that there was no proximate causal connection between its alleged negligence (which it denies vehemently) and the subsequent misappropriation of the funds taken from Brooks Bank. We reproduce in the margin the argument in support of this position.[5] We have pre-

---

5. "Even if the evidence had raised a fact issue as to some negligent act (and it did not), it is clear that no act or omission on the part of the Brooks Field National

Bank could possibly be a proximate cause of the injury or damage to the insurance companies. Frost treated the money as belonging to the two insurance companies

viously mentioned that Frost did not receive the funds restricted; and, had such funds been restricted, they would not have been transferred to the Alvin Bank on the verbal instructions of Cartsonas.

■ We need not belabor the question of proximate cause at this stage of the proceedings. A recent series of cases by our Supreme Court sets out the rules governing proximate cause.[6] The question of proximate cause is ordinarily one of fact and rarely lends itself to determination as a matter of law. We are of the opinion that Brooks Bank failed to establish, as a matter of law, its non-liability upon every theory presented by the plaintiff's pleadings.

Further, after the long and tedious review of the extensive deposition testimony, we are not convinced that Brooks Bank established, as a matter of law, that it was not a participant in the conspiracy alleged by plaintiff. There are many cases on the subject, *Schlumberger* having been mentioned previously being a leading authority on the subject. There are others which are likewise pertinent.

The case of International Bankers Life Ins. Co. v. Holloway, 368 S.W.2d 567 (Tex.1963), reached the Supreme Court after a trial to a jury and a review by the Court of Civil Appeals. Nevertheless, after analyzing the evidence extensively and commenting upon the fiduciary relationship of corporate officers and directors, Justice Steakley then went to the conspiracy question present there. In language appropriate to the case at bar, the court said:

"It cannot be said as a matter of law that the defendants acted independently of each other and that there was no concert of action in their systematic activities in these transactions. To so hold would usurp the fact finding functions of the jury, . . . which in a conspiracy case is largely in the area of inferences and deductions which may be drawn from the facts and circumstances shown by the evidence." (368 S.W.2d at 582)

Rule 166–A was not designed to deprive a litigant of his day in court nor was it designed to deprive a litigant of his right to a trial by jury on the issuable facts. Instead, its only purpose is the "elimination of patently unmeritorious claims or untenable defenses." Gulbenkian v. Penn, 151 Tex. 412, 252 S.W.2d 929, 931 (1952); Swilley v. Hughes, supra.

It follows, therefore, that we are of the opinion that the summary judgment was improvidently granted and must be reversed. "Moore" Burger, Inc. v. Phillips Petroleum Co., (Tex.1972) [16 Tex.Sup. Ct.Jrl. 11, 12 (October 4, 1972)].

The appeal of Alvin Bank is dismissed. The judgment of the trial court as to all of the appellees is now reversed and the cause is remanded for trial upon the merits.

Reversed and remanded.

STEPHENSON, Justice (dissenting).

I respectfully dissent. I am in complete agreement with the disposition made by the

---

and so transferred the funds that they ended up in accounts in the name of the two insurance companies in the First National Bank in Alvin.

"The authorities attempted to be relied on in connection with the matter of proximate cause represent the height (or nadir) of the far-fetched. Counsel cites two medical malpractice cases (Porter v. Puryear [153 Tex. 82] 262 S.W.2d 933 (Tex. Sup.Ct., 1954) and Hart v. Van Zandt, 399 S.W.2d 791 (Tex.Sup.Ct., 1966)) and a slip-and-fall case, Ice Service Company v. Scruggs, 284 S.W.2d 185 (CA Ft. Worth, 1955, n. r. e.). It would have made as much sense to cite a rape or murder case."

6. See, e. g., Baumler v. Hazelwood, 162 Tex. 361, 347 S.W.2d 560 (1961); Kaufman v. Miller, 414 S.W.2d 164 (Tex. 1967); Texas & Pacific Railway Company v. McCleery, 418 S.W.2d 494 (Tex. 1967); Enloe v. Barfield, 422 S.W.2d 905 (Tex.1967); Clark v. Waggoner, 452 S.W.2d 437 (Tex.1970).

majority of every facet of this case except Brooks Bank. I would affirm the judgment of the trial court as to Brooks Bank.

I am well aware of the onerous burden Brooks Bank had as movant and I am of the opinion that this Bank discharged its duty. I am convinced that the evidence shows as a matter of law that any action by Brooks Bank could not have been a "cause in fact" of the losses suffered by the two insurance companies.

The only charge made against Brooks Bank by the majority opinion is that it did not handle the two checks withdrawing the money from the insurance companies' accounts in the normal course through banking channels. That is, that the money represented by these checks was negotiated directly through the Federal Reserve Bank, rather than being deposited directly into the Frost Bank. My answer is that, regardless of how the checks were handled, the full amount of money arrived at the Alvin Bank to the account of its rightful owners, the two insurance companies, and its diversion occurred after that point. Even though proximate cause is ordinarily a question of fact, in my opinion, the lack of proximate cause has been established in this case as a matter of law.

ON MOTION FOR REHEARING

KEITH, Justice.

In our original opinion we overlooked the statement found in Gene Treiber's affidavit supporting his motion for summary judgment that he was divorced from Colleen Treiber (one of the stockholders in Rico) on February 21, 1968, and did not remarry Mrs. Colleen Treiber until September 14, 1968. From this premise he argues that he has conclusively shown that the Receiver has no cause of action against him for the series of events occurring on May 2, 1968. We agree, and now sustain Point One in the motion for rehearing filed by Gene Treiber.

Our original judgment is now amended and the judgment of the trial court insofar as it relates to Gene Treiber, and only as to the appellee Gene Treiber, is reversed and judgment is now rendered as to Gene Treiber. In all other respects our judgment of December 14, 1972 is now reaffirmed.

All other motions for rehearing, including that of Colleen Treiber, are overruled. Associate Justice Stephenson notes his dissent to the order overruling the motion for rehearing filed by Brooks Field National Bank.