N. M. BARRIER V. GEORGE C. BRINKMANN ET AL.

No. 6919. Decided November 3, 1937.
Rehearing overruled December 1, 1937.
(109 S. W., 2d Series, 462.)

*Montgomery, Hall & Taylor,* of Edinburg, *E. A. McDaniel,* of McAllen, *Crook & Cunningham* and *M. L. Lefler,* all of Beaumont, and *J. W. Williams,* of Port Arthur, for plaintiff in error.

It is error, where a case is submitted on special issues, to submit an issue that commingles law and fact, that is general in its nature, and that calls for a finding of more than one fact in answer to a general question. Standard v. Texas Pac. Coal & Oil Co., 47 S. W. (2d) 445; Wilson v. Jones, 45 S. W. (2d) 572; Thrower v. Brownlee, 12 S. W. (2d) 184; Theobalt v. Wiemann, 104 S. W. (2d) 589.

*Oliver J. Todd,* of Beaumont, for defendant in error.

The submission of an issue of two separate and distinct facts in one issue is not error, when in fact but one question is submitted in which different facts are alleged separately or cumulatively to show the same wrong. Atlantic Coast Line Ry. Co. v. Inabinette, 122 S. E. 902; Sloss-Sheffield Steel & Iron Co. v. Smith, 52 So. 38; Allen v. State, 32 S. W. (2d) 854.

MR. PRESIDING JUDGE HARVEY delivered the opinion of the Commission of Appeals, Section A.

This suit is comprised of what we shall term a main suit and a receivership suit, which were consolidated in the Court of

Civil Appeals. We shall first address ourselves to the main suit, laying aside the receivership suit until we have concluded examination and discussion of the questions pertaining to the main suit. In the main suit, the defendants in error, H. E. Brinkmann, and his children, George, Louis and Amanda Brinkmann, all of whom were adults before the year 1928, sued the plaintiff in error, N. M. Barrier, for damages. The cause of action for the damages claimed is alleged alternatively to be fraud and breach of contract on the part of Barrier, which caused the Brinkmanns to lose their property by the foreclosure of a deed of trust executed to secure a loan obtained by them from the American National Insurance Company of Galveston, which will be hereinafter called the Insurance Company. In the trial court the case was tried before a jury on special issues, resulting in a judgment against Barrier for damages in the sum of $94,-750.00. The Court of Civil Appeals found that $15,000.00 of this amount was awarded as exemplary damages, and in this single respect reversed the judgment and remanded the cause. As to the remainder, amounting to $79,750.00, the judgment of the trial court was affirmed. 80 S. W. (2d) 365. Barrier has been granted the writ of error.

Although we are convinced that various special issues, in the manner and form submitted to the jury by the trial court, are erroneous, we have concluded that a proper disposition of the case calls for a determination of the broader question, duly raised by Barrier, as to whether or not the evidence raises a fact question as to Barrier's liability for damages, either in respect of fraud or of breach of contract, as claimed by the Brinkmanns. Stated in a few words, the fraud, upon which the claim for damages is founded, consisted, according to the averments of the plaintiffs' petition, of a series of fraudulent acts and fraudulent conduct on the part of Barrier, which caused the Brinkmanns to lose their property by the foreclosure of the Insurance Company deed of trust, as hereinafter explained. The breach of contract declared upon is, substantially, the alleged failure of Barrier to negotiate a contract with the Insurance Company, which would operate to save the property from foreclosure under the deed of trust.

Since we are now primarily concerned with the matter of evidence, we shall notice the averments of the plaintiff's petition no further than to say that the above is, in substance, the grounds alleged as a basis for the claim for damages.

Upon the trial of the case, the following facts were shown in evidence, and upon which the judgment of the trial court depends.

H. E. Brinkmann and his wife owned all the real estate hereinafter mentioned, which was community property. His wife died, intestate, in the year 1916, and thereafter until sometime in November, 1930, H. E. Brinkmann controlled the management of the property in behalf of himself and children, all of whom were adults. All matters relating to their interest in the property inherited from their mother, except the mere act of signing deeds to or mortgages on the property, were committed by the children to their father, H. E. Brinkmann. Shortly before June, 1928, H. E. Brinkmann, who will be referred to simply as Brinkmann, negotiated for a loan from the Insurance Company. The negotiations were concluded and the loan, amounting to $125,000.00, was made on June 4, 1928. For the amount of the loan, all the Brinkmanns executed a note bearing interest at the rate of seven per cent. per annum. The note was payable in annual installments of $12,500.00 each, and the interest on the indebtedness was payable annually as it accrued. As security for the indebtedness, Brinkmann and his children duly executed a deed of trust which embraced the property in question, which consisted mainly of several city lots in Port Arthur, upon which were a number of large brick store buildings. Other property embraced by the deed of trust was unimproved city lots and some acreage property. In the deed of trust it was provided that failure in payment of principal and interest as same fell due, would, at the election of the Insurance Company, mature the entire indebtedness. It was also provided in said deed of trust that the entire indebtedness to the Insurance Company would mature, at the election of the company, in case a second or subsequent lien was placed on said property. On August 20, 1928, Brinkmann borrowed from J. H. Phelan the sum of $35,-000.00, for which all the Brinkmanns executed their note, which was payable one year after date; and to secure its payment Brinkmann and his children executed a deed of trust which embraced, among other real estate, the property embraced by the Insurance Company's deed of trust. As further security for the Phelan loan, Barrier, at the instance of Brinkmann's attorney, indorsed the Phelan note, for which indorsement Barrier charged $1,000.00, which Brinkmann paid. About this time Barrier (who was in the real estate business in Port Arthur), had a conversation with Mrs. Alma Ware Crosby, who testified that she had occasion to go to Barrier's office upon a mission of her own. Incidentally, the fact of Brinkmann mortgaging his property became a subject of the conversation. The substance of the conversation on this subject was given by Mrs. Crosby in her testimony upon the trial of this case, in the following words:

"And he told me he had just arranged a loan, or had something to do with it, for Mr. Brinkmann; that he had gotten Mr. Phelan to take a second lien and he seemed pleased over it. He said he had indorsed it and that Mr. Brinkmann had paid him $1,000 to indorse the second lien; that if he (Brinkmann) had known it he (Barrier) would rather indorse it than not, as he would control the loan; that the Brinkmanns were not good business people and if they fell down on the loan he could own the property some day. He said it was worth around a half million dollars; that the loan against it was not half—I think around $180,000. He seemed to think the loan was not half the value of the property. I said to him, 'Well, you'll have to pay it off,' and he said that with his credit he could get a new loan on it; that he and his boys were rental people and could work it out."

On June 4, 1929, the first installment of $12,500.00 of the principal of the Insurance Company note, together with a year's interest on the whole debt, fell due. Brinkmann paid the accrued interest at that time, but was unable, for want of funds, to pay the $12,500.00 installment of the principal.

On August 20, 1929, the Phelan note fell due and a renewal note was executed by the Brinkmanns which extended the time of payment of the entire amount of the Phelan debt for one year. Barrier indorsed this renewal note, and for this indorsement Brinkmann paid him the sum of $1,000.00.

About June 4, 1929, Brinkmann, through his attorney, opened negotiations with the Insurance Company to procure a reduction in the amount of the annual installments of principal provided in the Insurance Company note and deed of trust. The Insurance Company declined to consent to the proposal unless and until the annual installment of principal which fell due June 4, 1929, together with interest thereon from the last mentioned date to the time of payment, was paid. By December 7, 1929, the Brinkmanns, for the purpose of meeting this requirement, had managed to raise among themselves the sum of $6,400.00. On the last mentioned date Brinkmann borrowed from Barrier the sum of $9,000.00, for which Brinkmann and his children executed their note to Barrier, payable in monthly installments of not less than $1,000.00 each. As security for the payment of the debt Brinkmann and his children executed a deed of trust embracing three of the city lots embraced by the Insurance Company deed of trust, and upon which stood the large brick store buildings. They also at the same time executed to Barrier, as further security for the indebtedness, a written assignment of all the rentals to accrue from the brick buildings,

and authorized Barrier to collect said rentals as they accrued and apply them as follows: Pay over to H. E. Brinkmann each month the sum of $200.00 for living expenses, and the balance, less 2% allowed Barrier for his services in collecting the rentals, was to be applied by Barrier to the said indebtedness. It was further expressly provided in this instrument that upon full payment of the indebtedness from said rentals the assignment should become null and of no further effect, and all authority thereby given to Barrier should terminate. At the time these instruments were executed Barrier promised Brinkmann to withhold the deed of trust from record. This promise was false. He put the deed of trust of record a few days later.

The check for the $6,400.00 which the Brinkmanns had raised among themselves was turned over by the attorney of the Brinkmanns to Barrier, and this check, together with Barrier's check for $6,554.52 was, on December 10, 1929, forwarded by Barrier to the Insurance Company and the amount of both checks was received by the company in regular course. The aggregate amount of the two checks, being $12,954.52, met the requirement of the company that the installment of principal which fell due June 4, 1929, together with interest, be paid before the proposed rearrangement of the annual installments of the principal of the note to the company should be effected. In a word, all matured indebtedness of the Brinkmanns to the company thereupon became satisfied. This left a balance of $2,445.48 in the hands of Barrier which belonged to the Brinkmanns. This sum was allowed to Barrier, by Brinkmann's attorney, as a "commission" for making the loan. This disposition of the last mentioned sum was wrongful in that same was made without Brinkmann's knowledge or consent. On February 22, 1930, the Insurance Company and H. E. Brinkmann and his children entered into a written agreement, by the terms of which the payment of the remainder of the debt to the Insurance Company was so changed as to provide for the payment of the principal in eight installments of $6,250.00 each, and one installment of $62,500.00. The first of the eight installments mentioned was made payable June 4, 1930, and the other seven were made payable successively on the 4th day of June of each succeeding year. The ninth installment of $62,500.00 was made payable on June 4, 1938. In all other respects the terms of the note and deed of trust were continued in force. In the meantime, about January 20, 1930, the encumbered state of the Brinkmann property became the subject of conversation between Barrier and Brinkmann. In the conversation Barrier made certain proposals to Brinkmann respecting the handling of affairs pertaining to the

property. The proposals constituted the subject of discussion between Barrier and Brinkmann from time to time thereafter until sometime in the following May. With respect to these proposals Brinkmann testified as follows:

"He discussed with me the matter of his taking care of my business so as to prevent any foreclosure of the mortgages. I remember he proposed to handle my affairs so as to prevent any loss of my properties. He said this, that he would take care and collect the rents and give me a hundred dollars a month out of that for my living and pay the rest over to the Galveston Insurance Company; said he would handle it for two per cent., same as he was doing, and I would get a hundred dollars for my living expenses out of that and he would pay the rest out of it over to the American National, and that would take care of it and pay itself out. He proposed to arrange our affairs that there would be no foreclosure of the mortgage. He was to make the arrangement before our next installment to the American National became due. He discussed this matter and made these representations and promises to me more than once. During this time no one proposed to me or offered to help me, except Barrier. Barrier said he would take care of that; he did not want me to mess with anybody else. I took Mr. Barrier in my Model 'T' Ford out to see the boys. * * * He told the boys he was going to take care of this. I don't know just how you would say it, but take care of the loan so they would not foreclose on it; that he would handle it in a way that it could not be foreclosed or anything. Something like that. He said he knowed the American National officers—or something like that—and he could arrange that with them. He knew them. He said he would —he could arrange with them. He said he would. Barrier first took up the matter of representing me in the early spring sometime. He never did tell me that he was not going to arrange my affairs with the American National. Mr. Barrier said he was going to make a contract and I could sign it. He would have it fixed up. The contract he agreed to have prepared would provide for preventing a foreclosure. I talked with Mr. Barrier before he went up to Mr. Wister's office to get the contract prepared. Down in his office. I don't think he told me all that he was going to put in the contract. He said he was going to fix it up for me. I left the office when he did and followed him upstairs to Mr. Wister's office. I did not sit in on the dictation of that contract. He told me to stay out. That I could come back in the evening and get it. I went back and got it late in the evening. The contract he presented to me did not embody the terms which he agreed to put in the contract. Between the time of delivery

of that contract to me and June 4, I did not have an opportunity to refinance the properties and secure the necessary funds to meet the installment. Up to the time they presented this contract to me I relied on Mr. Barrier to carry out his agreement and save my properties from foreclosure. If Mr. Barrier had not repesented to me that he would save my properties from foreclosure or arrange to save them, I would have made other efforts. I had other people I would have dealt with but for this agreement."

In relation to the conversation between Barrier and Brinkmann and his sons on or about January 20, 1930, the testimony of Brinkmann's two sons is materially the same as that of Brinkmann hereinabove set out; and they, as well as Brinkmann himself, testified specifically to the fact that Barrier told them, in substance, that it would be necessary for the proposed contract to be drawn up and signed by them all and that he, Barrier, would have the contract drawn up. The instrument was· not drawn up until sometime in May and the undisputed evidence shows that the Brinkmanns refused to sign it and all further negotiations looking to the consummation of a contract respecting the subject, were abandoned. The instrument just mentioned, which the Brinkmanns refused to sign, purported to convey to Barrier, in trust, all the property affected by the several deeds of trust hereinbefore mentioned, and to invest Barrier with plenary power over said property, and the income thereof, for the purpose of liquidating all the said mortgage debts. It provided, also, for the furnishing by Barrier to Brinkmann of monthly reports or statements showing the things done and the money expended by him in the execution of the trust; and for a final accounting when the trust was performed. The instrument also provided that Barrier was to receive a commission of 25% of all moneys collected by him in the execution of the trust.

On June 4, 1930, an installment of the principal of Insurance Company note, amounting to $6,250.00, together with a year's interest on the whole debt, fell due. The Brinkmanns were unable to meet the payment and because of such nonpayment the Insurance Company on November 5, 1930, declared the entire indebtedness due, and the trustee in the deed of trust proceeded on that date, to advertise the property for sale. The undisputed evidence shows that the Insurance Company would have accepted payment of the matured installment at any time before November 5, 1930, and if same had been so paid, the company would not have declared the entire indebtedness due, as it did. A few days after November 5, 1930, the Brinkmanns filed suit seeking, among other things, an injunction against the proposed sale by

said trustee. Temporary injunction was issued against the trustee, and at or about the same time the court, through a receiver appointed by the court, took into custody the property embraced by the deed of trust. Ultimately on March 1, 1932, the Insurance Company recovered a judgment in the suit for the full amount of the indebtedness and for foreclosure of the deed of trust lien; and under the foreclosure the Insurance Company acquired title to all the property covered by the deed of trust except an acreage tract of 40 acres, which George C. Brinkmann claimed to be his homestead. The suit of the Brinkmanns herein for damages against Barrier is for this loss of their property.

The indebtedness of the Brinkmanns to J. H. Phelan remained unsatisfied until long after the proceedings to foreclose the lien of the Insurance Company commenced. With reference to the debt of $9,000.00 to Barrier, rentals of sufficient amount to satisfy the debt were, by August 1, 1930, collected by Barrier as they accrued, and applied by him to the debt, but with the knowledge and acquiescence of Brinkmann, Barrier continued after August 1, 1930, until November 5, 1930, to collect as they accrued all rentals arising from the buildings for the purpose of applying them on the Phelan note of which Barrier was indorser. The total amount of rentals thus collected by Barrier and applied as payment on the Phelan note was $3,650.00. During the entire period from December 7, 1929, to November 5, 1930, Barrier, on the 1st day of each month, gave Brinkmann a written statement showing the amount of rentals collected by him during the preceding month, and the disposition he had made of them.

█ It is to be remembered that the damages sought by Brinkmanns and for which they recovered judgment in the trial court are for the loss by Brinkmanns of their property under the foreclosure judgment of March 1, 1932, in favor of the Insurance Company. In one respect the action is one for damages resulting from the alleged fraud of Barrier and in another respect is for damages for the breach of a contract on the part of Barrier. With reference to the fraud aspect of the suit, it is the law that such an action does not lie unless deceit, which caused the loss complained of, is shown. Manifestly, too, a cause of action for damages for the breach of a contract does not arise in a case where such contract has never come into existence. In the present instance the record has been searched in vain for evidence of either of these essential ingredients of liability unless same can be found in the above testimony of Brinkmann. This testimony does not disclose an agreement of any sort, between Barrier and the Brinkmanns, save an oral agreement to

enter into a contract upon terms to be reduced to writing and agreed upon in the future. The oral agreement thus reached, considered in the light of the condition of affairs with which Barrier was to deal, plainly contemplates the investment of Barrier with powers of some sort for the purpose of accomplishing the object contemplated by the parties, namely, the saving of the Brinkmann property from foreclosure. The nature and extent of these powers were not defined or determined by the oral agreement but were left to be defined and determined by future agreement of the parties. An agreement of this sort does not, under the law, constitute a binding contract. Radford v. McNeny, 129 Texas 568, 104 S. W. (2d) 472; Saner-Ragley Lumber Co. v. Spivey, (Com. App.) 284 S. W. 210. Nor does any liability for fraud arise from Barrier's promise to effect an arrangement that would avoid a foreclosure of the Insurance Company's lien. The reason for this is that said promise, in the light of the attending circumstances, is reasonably susceptible of no other meaning than that such arrangement would be made when Barrier became invested with powers in that respect which remained to be defined and determined by agreement in the future. In a word, the performance of said promise depended upon the making of a contract in the future dealing with the subject. This being the case, the Brinkmanns were not justified in relying on the promise being performed until the condition upon which performance depended was satisfied. Since this condition never was satisfied, Barrier never became chargeable with fraud because of said promise.

■ With respect to the other branch of the consolidated case, which involves a receivership, but little need be said. It appears that during the progress of the main case in the trial court, Barrier conveyed certain real estate, which he owned, to his daughter, Mrs. Miriam B. Hall. Whereupon the Brinkmanns instituted against Mrs. Hall and her husband and Barrier a separate suit to set aside said conveyance on the ground, substantially, that same was made to defraud the Brinkmanns by placing said property beyond the reach of an execution issued on the judgment rendered in the main case. The trial court appointed a receiver to take into custody all of said property and hold same pending the disposition of the main case. In view of the conclusion we have reached regarding the main case, it becomes unnecessary to consider the errors complained of in the receivership suit. The respective judgments of the trial court in both suits are reversed. The judgment of the Court of Civil Appeals in the consolidated suit is in all respects reversed and, inasmuch as it appears that the case, as it respects the alleged

liability of Barrier for damages, has been fully developed in the trial court,—having been tried twice there—judgment is here rendered that the Brinkmanns take nothing on their claim for damages. As regards the branch of the consolidated case which involves the matter of receivership, judgment is here rendered in favor of Mrs. Miriam B. Hall, and her husband, J. C. Hall, and N. M. Barrier, and it is ordered that a certified copy of this judgment be transmitted to the trial court with instructions to dissolve said receivership and restore all said property to Mrs. Miriam B. Hall.

Opinion adopted by the Supreme Court November 3, 1937.

Rehearing overruled December 1, 1937.