The BANK OF EL PASO, f/k/a Cielo Vista Bank, Appellant,

v.

T.O. STANLEY BOOT CO., INC., T.O. Stanley, James S. Ruby, Lawrence Harmel, Henry C. Tyler, a/k/a H. Tim Tyler, and E. Guy Merrell, Appellees.

No. 08–90–00048–CV.

Court of Appeals of Texas, El Paso.

April 24, 1991.

Rehearing Overruled May 22, 1991.

Thomas E. Kurth, Haynes and Boone, Dallas, Rodney W. Baxter, Hardie, Hallmark, Sergent, Hardie & Langford, William B. Hardie, Jr., Hardie/Sergent, El Paso, W. Alan Wright, Haynes & Boone, Dallas, for appellant.

Bob Roberts, Law Offices of Bob Roberts, Austin, Thomas W. Brady, Pulner & Brady, Warren Pulner, Pulner & Brady, El Paso, Tom Stockton, Law Offices of Tom Stockton, Austin, Corey W. Haugland, Grambling & Mounce, El Paso, for appellees.

Before OSBORN, C.J., and FULLER and WOODARD, JJ.

## OPINION

FULLER, Justice.

Appellant Bank sued its borrowers/guarantors who in turn successfully asserted lender liability claims and affirmative defenses against the Bank. We reverse and render judgment for the Bank.

## FACTS

The Bank of El Paso, f/k/a Cielo Vista Bank (BANK) initiated this lawsuit seeking to recover on certain promissory notes and guaranties as well as asking for foreclosure of its security interests on certain collateral (bootmaking equipment). The borrowers successfully defended on the basis of lender liability claims and affirmative defenses. The effect of the jury verdict was to void all indebtedness to the BANK, and in addition, the jury awarded over $6 million to the boot corporation, the individual guarantors plus interest and attorney's fees in the event of an appeal. The trial court entered judgment on the verdict and all post-verdict motions were overruled.

## POINTS OF ERROR

Appellant BANK is before us asserting a multitude of claimed trial court errors.

The BANK insists that the trial court should have granted its Motion for Judgment Non Obstante Veredicto and its Motion for New Trial. The Appellant also asserts the trial court erred in entering a judgment for damages resulting from a jury finding of (1) fraud; (2) breach of contract; (3) deceptive trade practice violations; (4) duress; (5) usury; and (6) impairment of collateral. The BANK also asserts that the trial court erred in entering judgment finding that it was not entitled to recovery on its own causes of action.

## BACKGROUND

T.O. Stanley, a bootmaker, purchased a bootmaking company in 1979, incorporating the company under the name of T Bar S Inc. In the fall of 1986, the corporation filed for bankruptcy. At that time, the boot corporation owed the Appellant BANK approximately $66,000.00, the debt being secured by the bootmaking equipment. The equipment was abandoned by the trustee in bankruptcy.

Thereafter, T.O. Stanley acquired some investors and approached the BANK seeking financing for a proposed new corporation as well as acquiring the bootmaking equipment that had been released to the BANK by the trustee in bankruptcy. Financial statements of the investors, projections of cash flow and profits of the proposed new corporation were requested by the BANK.

## THE NEW BOOT BUSINESS

A new corporation was subsequently formed: T.O. Stanley Boot Co., Inc. (CORPORATION).

Stanley and some of the new investors (STANLEY GROUP) met with Clarke Harvey and Daniel Nasser, officers of Cielo Vista Bank on December 5, 1986, concerning financing for the new corporation. Included in this discussion were start-up costs, capital investments, prospective investors and necessary documents for qualifying for a loan. The group discussed coming up with $250,000.00 in capital with the possible need of a $500,000.00 loan. There was also discussion of Stanley's outstanding personal debt with the BANK for $43,-858.82, as well as the equipment previously owned by T Bar S being available for purchase for the amount of the outstanding debt on the equipment of $68,152.30. No documents were prepared or signed at this meeting. Prior to the next meeting, Daniel Nasser, bank officer, sent Clarke Harvey an interoffice memo detailing the T Bar S equipment as well as the notation that he had "requested the personal resumes on the principals of the new firm for the SBA package."

On December 19, 1986, Stanley, Merrell, Harmel and Tyler executed various loan documents with the BANK. The CORPORATION, represented by Stanley, president, executed a security agreement to the BANK in the amount of $68,152.30 pledging equipment and machinery being purchased from the BANK. Harmel, Merrell and Tyler executed guaranties for Stanley's personal note to the extent of $43,-858.82 each.

On January 16, 1987, the CORPORATION, Stanley as president and Tyler as director and chief executive officer signed a commercial loan application for a draw note and a promissory note in the amount of $85,000.00 with the stated purpose of paying opening expenses and purchase of initial inventory of raw materials. The maturity date was April 16, 1987, with stated interest at prime plus 2 percent. On April 9, 1987, the notes in the amounts of $68,-152.30 and $85,000.00 were consolidated into a new note in the amount of $153,-570.62.

On June 17, 1987, the CORPORATION, represented by all directors, Harmel, Tyler, Stanley, Ruby and Merrell, signed and approved the U.S. SMALL BUSINESS ADMINISTRATION RESOLUTION OF BOARD OF DIRECTORS OF T.O. STANLEY BOOT CO., INC., with the explicit agreement that all undersigned parties would deliver to the BANK or SBA any and all requested documents including the application for a loan not to exceed $500,-000.00 and a promissory note evidencing this loan along with any other instruments or agreements. On that same date, June

17, 1987, the Board of Directors of T.O. STANLEY BOOT CO., INC., held their organizational meeting. Standard business transpired including the acceptance of articles of incorporation, issuance of common shares, election of directors and officers, as well as, ratification of actions of corporate officers, directors and agents. Included was the ratification of: (3) corporate indebtedness of approximately $153,000.00 to Cielo Vista Bank, El Paso, Texas, and (4) application of CORPORATION for SBA loan in the original principal amount of $500,000.00.

On June 24, 1987, Ruby contacted Frank Bashore at the BANK requesting an additional loan of $20,000.00 to purchase leather. Ruby executed a continuing guaranty to accommodate T.O. STANLEY BOOT CO., INC., for an unlimited amount on the same day. Then on June 30, 1987, Ruby contacted the BANK seeking additional funding in the amount of $13,000.00 to cover expenses due to Marvin Company for additional funds to be deposited into the company's checking account. Ruby again signed a continuing guaranty to accommodate T.O. STANLEY BOOT CO., INC., for an unlimited amount on the same day.

*On July 8, 1987, the SBA Loan Application was approved by the SBA for a loan of $500,000.00.*

On July 17, 1987, Ruby requested an additional $30,000.00 to buy leathers. Ruby signed a blank continuing guaranty to accommodate T.O. STANLEY BOOT CO., INC., with the amount of $300,000.00 being filled in at a later time. Also on July 17, 1987, Stanley, Harmel and Merrell executed a continuing guaranty to accommodate T.O. STANLEY BOOT CO., INC., to the extent of $300,000.00. On July 31, 1987, Stanley, Merrell, Tyler, Ruby and Harmel executed a commercial loan application and a promissory note for a loan in the amount of $216,570.62, which was a consolidation of the previous notes in the amounts of $153,570.62, $20,000.00, $13,-000.00 and $30,000.00, with a stated purpose of combining four commercial loans with loan proceeds designated as start-up expenses and purchasing inventory of raw materials. Maturity date was October 29, 1987, with stated interest at prime plus 1.25 percent. On October 29, 1987, the note in the amount of $216,570.62 was renewed with the accrued interest being paid.

*On or about September 28, 1987, T.O. STANLEY BOOT CO., INC. and the STANLEY GROUP rejected the $500,-000.00 SBA Loan proposal from the BANK.* The stated reasons for rejecting the loan were the collateral terms for liens on Ruby's stock and Harmel's real estate.

After rejection of this loan, the BANK declined to make any additional loans to the CORPORATION unless additional collateral was provided by the STANLEY GROUP to secure the loan.

Not until November 3, 1987, in a letter to the BANK, was there any attempt by the STANLEY GROUP to assert a requested line of credit for $500,000.00 with amortization being *suggested* at a rate of $8,500.00 per month. In the next letter dated November 10, 1987, the STANLEY GROUP asserts that the BANK had lead the group to believe that it would "advance additional funds up to a total commitment of $500,-000.00." On November 24, 1987, the CORPORATION, Stanley as president and Ruby as vice president, executed a note in the amount of $236,377.61 with a maturity date of May 22, 1988, and a stated interest rate of prime plus 1.25 percent. This note was a renewal of the existing note of $216,-570.62 with interest being "rolled over" into the new note including the additional loan in the amount of $17,969.15 for an advance by Ruby on the interest due.

On February 26, 1988, the combined meeting of the shareholders and directors was held and standard business transpired mainly consisting of election to offices for the calendar year 1988. There was a review and discussion of the financial statements with no action taken. Also at this meeting, Ruby's offer to advance the corporation additional amounts up to $100,-000.00 on an "as need be" basis was adopted with such advances being considered indebtedness of the corporation. Ruby continued to infuse funds until May

of 1988. T.O. STANLEY BOOT CO., INC., ceased doing business in August 1988.

The BANK note for $236,377.61 matured on May 22, 1988. On or about July 14, 1988, demand was made on the CORPORATION and the STANLEY GROUP for payment of the outstanding note and surrender of the collateral securing the note.

On August 5, 1988, the BANK filed suit on the corporation note and filed an application for a temporary injunction against the CORPORATION to prevent any disposition of the collateral securing the outstanding note. A temporary injunction was issued on August 15, 1988.

The BANK took constructive possession of the equipment in November of 1988. The equipment remained on the leased premises through an arrangement between the landlord and the BANK with the BANK agreeing to pay the rent. The BANK, from November 1988 through March 1989, paid rent in the total amount of $7,500.00. In March of 1989, a hearing was held and it was determined that T.O. STANLEY BOOT CO., INC., was responsible for the rent beginning in April of 1989.

On October 12, 1988, the BANK obtained an interlocutory default judgment against Tyler on the entire corporate indebtedness and accrued interest.

The BANK also filed a separate suit against Stanley, Merrell, Harmel and Tyler on Stanley's personal note, which was consolidated with this suit seeking payment on the outstanding indebtedness to the BANK. Initially, it should be noted that all claims by the CORPORATION and the STANLEY GROUP are based on the allegation of a promise by the BANK to extend a $500,000.00 line of credit to the CORPORATION made at a meeting on December 5, 1986.

## WAS THERE A VALID AND ENFORCEABLE AGREEMENT TO LOAN $500,000.00?

The instant case revolves around the existence or nonexistence of a valid and binding oral agreement. The pleadings of all Appellees refer to an agreement by Appel-

lant to advance $500,000.00 by using various terminology as *"line of credit,"* or a *"breach of contract to loan,"* or a *"loan commitment."*

The BANK asserts that the trial court erred in denying the BANK'S Motion for Judgment Non Obstante Veredicto and Motion for New Trial and in rendering judgment for the Appellees for breach of contract because there is no evidence or insufficient evidence: (1) of any enforceable agreement; (2) that necessary material terms of any alleged oral agreement were present; (3) that the BANK breached an alleged oral agreement; (4) that any breach of an alleged oral agreement by the BANK was the proximate cause of any damages to the Appellees; and (5) to support the jury's answer to question number three. In question number three, the jury found that the essential terms to the loan were present and that the BANK failed to make the loan.

In order to reach the issue of breach of contract, it must be established that a valid and binding contract or agreement was in existence. The essence of a contract is an agreement. *Laredo Hides Company Inc. v. H & H Meat Products Company*, 513 S.W.2d 210, 223 (Tex.Civ. App.—Corpus Christi 1974, writ ref'd n.r. e.). Whether written or oral, the elements of a contract are identical and must be present for a contract to be binding. In the case of an express contract, mutual agreement is expressly stated. In an implied contract, mutual agreement must be inferred from the circumstances of the transaction. *Haws & Garrett General Contractors, Inc. v. Gorbett Brothers Welding Company*, 480 S.W.2d 607, 609 (Tex.1972). The conduct and circumstances surrounding the transaction are to be viewed from a reasonable person's interpretation at that particular point in time. *Id.* In a suit on a contract, proof of the making of the contract precedes proof of the facts constituting the breach. *Western Tank & Steel Corporation v. Gandy*, 385 S.W.2d 406, 409 (Tex.Civ.App.—Texarkana 1964, no writ). A court should provide a

remedy if the parties intended to make a contract and the contract's terms provide a sufficiently certain basis for determining that a breach had in fact occurred and the nature of the remedy called for. *Texas v. New Mexico*, 482 U.S. 124, 129, 107 S.Ct. 2279, 2284, 96 L.Ed.2d 105, 114 (1987).

 Under contract construction and interpretation, there must be *mutuality of obligation*. The formation of a contract requires both parties to intend to be bound by the promise. Where a contract imposes no definite obligation on one party to perform, it lacks mutuality. The alleged obligation on the BANK was to loan the STANLEY GROUP $500,000.00 on a line of credit WHEN the CORPORATION had reached $250,000.00 in capital contribution. The obligation on the STANLEY GROUP was the raising of $250,000.00 in capital. There were no time limits, as demonstrated at trial, for the raising of the capital, therefore, there was a lack of definite obligation being imposed on one party. The STANLEY GROUP claims that they raised the capital investment by August of 1987, therefore, at that time, the BANK should have honored its promise. But, was the six months' elapsed time from the discussion to performance a *reasonable* time to require the BANK to hold open an alleged promise for a line of credit? Especially where this promise is not evidenced in writing at any time. This alleged promise does not qualify as a *condition precedent* to a contract because first there must be shown the existence of a contract for the condition to attach.

 An agreement to make a future contract must be definite and certain upon all the subjects to be embraced in such future agreement. Thus, to be enforceable, a contract to enter into a future contract must specify all its material and essential terms, and leave none to be agreed upon as a result of future negotiations. *Parker Chiropractic Research Foundation v. Fairmont Dallas Hotel Company*, 500 S.W.2d 196, 201 (Tex.Civ.App.—Dallas 1973, no writ). Courts cannot make contracts for the parties and an agreement to enter into negotiations in the future cannot

be enforced because the court has no means to determine what sort of contract the negotiations would have produced. *Weitzman v. Steinberg*, 638 S.W.2d 171, 175 (Tex.App.—Dallas 1982, no writ). Where any *essential* term of a contract is open for future negotiations there is no binding contract. *Gerdes v. Mustang Exploration Co.*, 666 S.W.2d 640, 644 (Tex. App.—Corpus Christi 1984, no writ).

 The alleged promise for the line of credit was oral; there was no evidence of a writing. An oral agreement may be enforceable provided testimony can show that there has been agreement on the material terms of the agreement. *Texaco, Inc. v. Pennzoil, Co.*, 729 S.W.2d 768 (Tex.App. —Houston [1st Dist.] 1987, writ ref'd n.r. e.), *cert. dism'd*, 485 U.S. 994, 108 S.Ct. 1305, 99 L.Ed.2d 686 (1988). The basic material terms include the principal amount to be loaned, how money would be advanced, interest rate to be charged, loan closing date, term or duration of the loan and whether repayment is to be in lump sum or installment. *Champaign National Bank v. Landers Seed Co., Inc.*, 165 Ill. App.3d 1090, 116 Ill.Dec. 742, 745, 519 N.E.2d 957, 960 (1988); *Stansel v. American Security Bank*, 547 A.2d 990, 993 (D.C.App.1988); *McErlean v. Union National Bank of Chicago*, 90 Ill.App.3d 1141, 46 Ill.Dec. 406, 410, 414 N.E.2d 128, 132 (1980). The omission or indefiniteness of an essential element of a contract renders the whole contract unenforceable. *Neeley v. Bankers Trust Company of Texas*, 757 F.2d 621, 630 (5th Cir.1985); *Mesa Petroleum Company v. Coniglio*, 629 F.2d 1022, 1026 (5th Cir.1980); *Gerdes v. Mustang Exploration Co.*, 666 S.W.2d 640, 644 (Tex.App.—Corpus Christi 1984, no writ). "A contract is sufficiently definite if a court is able to determine the respective legal obligations of the parties." *South Hampton Co. v. Stinnes Corp.*, 733 F.2d 1108, 1122 (5th Cir.1984); see, e.g., *Estate of Griffin v. Sumner*, 604 S.W.2d 221, 229 (Tex.Civ.App.—San Antonio 1980, writ ref'd n.r.e.); *Moore v. Dilworth*, 142 Tex. 538, 542, 179 S.W.2d 940, 942 (1944). If an alleged agreement is so indefinite as to

make it impossible for a court to fix the legal obligations and liabilities of the parties, it cannot constitute an enforceable contract. *University National Bank v. Ernst & Whinney,* 773 S.W.2d 707, 710 (Tex.App.—San Antonio 1989, no writ). The jury may not be asked or required to furnish an essential term in a contract where the parties were unable to complete the contract by mutual agreement. *Weitzman v. Steinberg,* 638 S.W.2d 171, 175 (Tex.App.—Dallas 1982, no writ). A court cannot enforce a contract unless it can determine what it is. It is not enough that the parties think that they have made a contract; they must have expressed their intentions in a manner that is capable of understanding. *Bendalin v. Delgado,* 406 S.W.2d 897, 899 (Tex.1966).

The CORPORATION and the STANLEY GROUP claim that the BANK entered into an oral agreement to provide the Appellees with a line of credit in the amount of $500,000.00 to finance the operations of the CORPORATION. This promise purportedly occurred at a meeting on December 5, 1986. Present at that meeting were: (1) Mr. Clarke Harvey, president of the bank; (2) T.O. Stanley; (3) Mr. Guy Merrell; (4) Mr. Tim Tyler; and (5) Mr. Steve Jay. At this meeting, the STANLEY GROUP was requested to submit pro forma information indicating expected spending, loses and/or profits, and financial statements of the investors. There was also discussion of the possible need of a half-million-dollar credit line, the necessary capital infusion of $250,000.00, the outstanding personal note of T.O. Stanley of $43,858.82, and the old T Bar S equipment that was in the BANK'S possession that could be bought for the amount of the outstanding balance on the equipment of $68,152.30.

Under these facts, the general discussion of the alleged $500,000.00 line of credit was vague as to the material terms of the agreement. Harvey, the Bank president, testified during trial that in order for the bank to be able to commit to a $500,000.00 loan:

A. I would have had to determine the specific amount, the specific terms, the collateral, who was going to guaranty [sic] the loan if any one was going to, the interest rate and any other particular provisions that would relate to the credit itself.

Reduce that to a loan application, such as the ones we've been discussing here. As an example, Defendant's Exhibit 39 is the type of written memorandum or application that I would have had to have prepared submitted along with the financial information and any other comments that I wanted to make about the loan request to our directors loan committee and they would either then approve or disapprove the request and that would then be eventually communicated to the borrower.

Q. Was that done in this case?

A. No, it was not. There was never any request made specifically nor did we discuss any of those particular terms that would have been necessary to get a request presented.

Q. For example, interest rate. Was that discussed?

A. No, sir.

Q. Term?

A. No, sir.

The STANLEY GROUP contends that Clarke Harvey promised to give the group a $500,000.00 line of credit in the form of a loan commitment in return for the personal guaranties of Harmel and Merrell on Stanley's outstanding personal note *and* the CORPORATION'S payment of the T Bar S outstanding debt on the equipment. Harvey's testimony is that he never could have made such a statement or promise because it would take committee approval as well as documentation and signatures, of which none exist, for any loan amount over $200,000.00. Mr. Harvey denied any requirement that Harmel and Merrell guarantee the personal note of Stanley and payment of the T Bar S outstanding debt on the equipment. Also, there is testimony by Tyler that he never understood anything said in the December 5, 1986 meeting to indicate that the BANK would extend a

$500,000.00 line of credit. It is evident from the testimony that there was no mutuality of obligation present among the parties involved due to the discrepancies in testimony and individual understandings of what transpired at the meeting concerning loans to the CORPORATION.

T.O. Stanley testified at trial concerning what was discussed at the December 5th meeting. When Stanley was questioned on the witness stand about the particulars of the agreement, he was evasive. When asked "what was the agreement with regard to the interest rate to be charged on that?" Stanley would state "I can't answer that question for you. . . . I'd rather you get into that with Mr. Merrell or someone that knows something about numbers." When asked again "was the interest rate discussed?" Stanley replied, "I'm sure it was. . . . Well, I'm reasonably sure it was. That's when you borrow money and interest rates are generally discussed, so I'm basing it on that." Stanley added that he could "remember that Mr. Harvey always charged us one and a half to two and a half over prime" but, that was not in regard to present dealings with this group of investors. When finally asked "[y]ou can't remember whether or not, in fact, the interest rate was discussed?" Stanley simply stated "[n]o sir, I will only assume that it was."

Stanley was questioned on the duration or dates of maturity of the alleged agreement which he replied "as I remember, this loan was to be available to us and we would use the amounts as the company proceeded or grew. It wasn't going to be borrowed all at one time." When asked "how long did you have to pay it back?" Stanley simply said "I can't answer that. I didn't know when I was going to borrow it." Stanley could not recollect whether there had been any discussion on how or when the loan was to be paid back. Regarding any security or collateral, Stanley could only recall that at that meeting Harvey asked for personal financial statements. When asked again, Stanley replied, "I'm sure [collateral or security] it was discussed, but I do not remember the conversation and the terms of it—the loan."

The only conditions placed on the agreement by Harvey, as Stanley recalls, were the financial statements, guaranties on Stanley's personal note for $43,858.82, and to clear up the debt of the $68,152.30 owed on the equipment repossessed by the BANK when T Bar S went bankrupt.

Stanley admitted that the agreement was "verbal," that no document was ever prepared or signed at any time by anybody in the courtroom stating that the BANK would grant them a $500,000.00 credit line.

Contrary to Stanley's testimony, Mr. Tyler testified that the BANK committed to lending the investors $153,570.62 with $85,000.00 going to start-up and $68,152.30 going to the purchase of the T Bar S equipment in the BANK'S possession. Tyler, when asked "did you take the statement . . . or the conversation exchanged between Mr. Merrell and Mr. Harvey as an indication that the bank was, in fact, committing to loan your group $500,000?" He replied, "[a]bsolutely not." Tyler stated that he never felt like the BANK had committed on a $500,000.00 line of credit and that the first he heard of any such claim was when Mr. Merrell called him after this suit was filed and a judgment was rendered against Tyler as personal guarantor. Tyler testified that the topic of a $500.000.00 loan from Cielo Vista Bank did not arise until "[f]ive or six months down" from the meeting in December. It was at that time the group mentioned trying to get a $500,000.00 line of credit and Tyler testified that Harvey stated the BANK turned them down because "[i]t's just too soon and we can't do it." Next, the STANLEY GROUP considered an SBA loan with Tyler's suggestion that they could pay the BANK off and still have approximately $250,000.00 to get through until the end of the year. Tyler testified that the group was in agreement to pursue the SBA loan and signed a board resolution to that effect. The SBA package was put together by Mr. Frank Bashore of the BANK, with the STANLEY GROUP'S help and approval, submitted to the SBA on June 24, 1987, and it was approved on July 8, 1987. The approved amount of the loan was $500,000.00. Tyler

testified that there was no surprise in the SBA requiring personal guaranties or collateral because those were standard questions in the application that had to be answered in order to qualify for the loan. The STANLEY GROUP turned the requested $500,000.00 loan down because "they were asking for too much collateral for $500.000...."

Tyler recalled, while testifying, that Harvey brought up the subject of Stanley's outstanding personal debt by asking the group "Now, what are we going to do about this personal obligation of Mr. Stanley's?" ... "Would you fellas be willing to personally guaranty his indebtedness?" Tyler went on to explain that the group was "doing everything to keep Mr. Stanley's name clean. ... keep him from going personally bankrupt."

In Harvey's testimony, he stated the personal guaranties on Stanley's personal note were "absolutely not" a condition to getting the corporate loan. Nor, was the payment of $68,152.30 for the purchase of the equipment previously owned by T Bar S a requirement to getting the initial loan. Harvey testified that the amount of $68,-152.30 represented the price that the BANK was willing to sell the equipment for, it was the amount of the remaining outstanding loan.

## CONCLUSION AS TO A LOAN AGREEMENT

The record clearly demonstrates that the only essential term provided by any testimony was the alleged amount of the loan. Other essential terms necessary to make the oral commitment binding as if it were a written agreement were conspicuously absent. None of the defendant's offered evidence of any specific terms of the alleged agreement beyond the alleged amount to be loaned. Such terms include what type of loan (allegedly a line of credit), the interest rate to be charged, the duration of the loan, when the loan is to be extended, and how the loan is to be repaid. The alleged oral agreement is so vague that the Court may *"fill in"* some but not all the missing terms.

*The claim of breach of contract fails for lack of certainty of the contract terms.*

THEREFORE, AS A MATTER OF LAW, THERE WAS NO BINDING AGREEMENT AND HENCE NO BREACH OF CONTRACT ACTION AGAINST THE BANK.

Even if we are incorrect in finding there was no binding loan agreement, then the evidence supports a finding that the offer by the BANK to extend a $500,000.00 SBA backed loan satisfied that loan commitment. Application was made by Appellees for the SBA loan and proper corporate resolutions were passed pertaining to the SBA backed loan. The loan was approved by SBA and only thereafter did Appellees reject the loan.

## APPELLEES' CLAIMS

FRAUD—Where there is a determination that there was no contract, then there is no contract liability. Where there is no contract liability, then there is no tort liability, regardless of whether there was or was not an intention to perform the promise. *Guaranty Bank v. Lone Star Life Insurance Company,* 568 S.W.2d 431, 434 (Tex.Civ.App.—Dallas 1978, writ ref'd n.r.e.). Any tort claim based on the promise would have to be founded on detrimental reliance, and no reliance on a promise is justified if the promise is expressly subject to a condition that has not been met. *Barrier v. Brinkmann,* 130 Tex. 350, 109 S.W.2d 462, 467 (1937). The issue of fraud in tort, based on the offer to loan the STANLEY GROUP $500,000.00, must fail. There was no false or misleading statement by the BANK because the alleged oral agreement was fulfilled through the offer of the SBA backed loan. The record does not indicate that the alleged oral agreement was exclusive as to where the funds came from.

DECEPTIVE TRADE ACT CLAIM—The DTPA claim, as a matter of law, is inapplicable in the instant case because the mere lending of money is not an actionable cause of action. The purpose of the DTPA is to protect "consumers" who

seek or acquire "by purchase or lease, any goods or services." Tex.Bus. & Com.Code Ann. § 17.45(4) (Vernon 1987). The Texas Supreme Court has held that the mere lending of money is not a good or service provided to a consumer within the meaning of the DTPA. *Riverside National Bank v. Lewis*, 603 S.W.2d 169 (Tex.1980). Although the Court has found a borrower to be a consumer where there has been a showing that the lender's extension of money was directly related to acquiring goods or services, *La Sara Grain Company v. First National Bank of Mercedes*, 673 S.W.2d 558, 566 (Tex.1984), the facts of this case do not lend themselves to this interpretation.

■ DAMAGES—When a distinct, willful tort is alleged and proved in connection with a suit upon a contract one may recover exemplary damages, but even in that instance the complainant must prove that he suffered some actual damages. *City Products Corporation v. Berman*, 610 S.W.2d 446 (Tex.1980).

Where it has been established that there was no oral agreement as a matter of law (no contract or breach), no·fraud (no detrimental reliance on a nonexistent contract), and no DTPA violations (mere lending of money insufficient) there is no basis for damages.

### APPELLEES' DEFENSES

■ DURESS—The defense claim of duress is unmaintainable without the finding of an agreement to coerce someone into doing something they otherwise might not do. The question of what constitutes duress is a matter of law and the question of whether it exists in a particular situation is generally a question of fact. In *State National Bank of El Paso v. Farah Manufacturing Company, Inc.*, 678 S.W.2d 661, 684 (Tex.App.—El Paso 1984, writ dism'd by agr.), this Court reiterated that there can be no duress unless (1) there is a threat to do some act which the party threatening has no legal right to do; (2) the threat is of such character as to destroy the free agency of the party to whom it is directed; (3) the restraint caused by the

threat is imminent; and (4) the person to whom the threat is directed has no present means of protection.

■ In the instant case, Merrell asserts duress in requiring him to guarantee Stanley's personal note as a condition precedent to the BANK extending an alleged $500,-000.00 line of credit to the CORPORATION. The alleged oral loan commitment was made on December 5, 1986. Merrell signed the guaranty on Stanley's personal note on December 19, 1986.

As stated previously, there is no evidence to support the formation of an oral agreement to extend to the CORPORATION a $500,000.00 line of credit. Without such a finding, there can be no coercion or duress in Merrell's signing as a guarantor on Stanley's personal note. The evidence is void of any testimony that the BANK (1) committed to extend the loan for $500,000.00, (2) then refused to follow through with the loan until (3) the guaranty was signed. What the evidence does reflect is that on December 5, 1986, there was a discussion of the CORPORATION coming up with $250,000.00 in capital with the possible need of a $500,000.00 loan. On December 19, 1986, when the guaranty was signed by Merrell, there is no evidence that there was mention of the alleged $500,000.00 line of credit, or that this purported credit would not be extended until the guaranty was signed.

■ Merrell asserts that any coercion of another, either mental, physical or otherwise causing him to act contrary to his own free will or submit to a situation or a condition against his own volition or interest constitutes duress. *Pierce v. The Estate of Haverlah*, 428 S.W.2d 422 (Tex.Civ. App.—Tyler 1968, writ ref'd n.r.e.). Merrell failed to carry his burden in producing evidence that he acted contrary to his own interest and his own free will. Although Merrell stated at trial that he felt "he had a gun to his head" when he was told of Stanley's outstanding debt and that something needed to be done regarding the debt at the December 5, 1986 meeting, he did not sign the guaranty until December 19,

1986. Merrell failed to prove that any purported threat was imminent. Also, as of December 19, 1986, Merrell had not invested any funds into the CORPORATION and therefore had sufficient present means to protect himself from guaranteeing Stanley's personal note for the benefit of the CORPORATION. He had several options available including declining to sign a guaranty or backing out of the deal completely, among others.

As a matter of law, the elements of duress were not sufficiently proven in order for a question on the issue of duress to go to the jury.

■■■ USURY—The facts asserted by the STANLEY GROUP were that the BANK, as a condition to the granting of a loan of approximately $153,570.62 to the CORPORATION, required Harmel and Merrell to guarantee the existing personal note of T.O. Stanley in the approximate amount of $43,858.00. Texas courts have held that:

> Where a lender, as a condition of a loan and as a consideration for making it, requires the borrower to **assume or pay in whole or part,** the debt that another owes to this same lender; that the amount of the assumed or paid-off debt will be considered as interest in determining whether or not the loan is usurious. [Emphasis added].

*Laid Rite, Inc. v. Texas Industries, Inc.,* 512 S.W.2d 384, 389 (Tex.Civ.App.—Fort Worth 1974, no writ); *Stephens v. First Bank and Trust of Richardson,* 540 S.W.2d 572 (Tex.Civ.App.—Waco 1976, writ ref'd n.r.e.). The application of usury as a defense will be permitted only where a lender requires a borrower to **pay** or **assume** a third party's debt as a condition to making a loan. *Alamo Lumber Company v. Gold,* 661 S.W.2d 926, 928 (Tex.1984).

■■■ The facts in this case do not lend themselves to application of the usury defense. Harmel and Merrell were asked to *guarantee, not assume or pay,* the personal note of T.O. Stanley. Usury is a defense available only to the obligor on a note. For Harmel and Merrell to step into the shoes of the obligor, they would have had to have

*assumed or paid* T.O. Stanley's outstanding note. But, Harmel and Merrell became obligors only on their respective written guaranties, and therefore not subject to the usury defense. *Houston Sash and Door Company, Inc. v. Heaner,* 577 S.W.2d 217, 222 (Tex.1979). The defense claim of usury under the facts of this case are, as a matter of law, inapplicable because of lack of standing.

■■■ IMPAIRMENT OF COLLATERAL—Impairment of collateral was asserted as a defense to liability on the notes. This defense is unavailable to the STANLEY GROUP because of their position as guarantors to the note for purchase of the equipment. Also, the guaranty instrument itself waived such relief. The Texas Supreme Court has held recently that a guarantor is not a party to a promissory note, and a guaranty is not an instrument, as defined in the Tex.Bus. & Com.Code Ann. § 3.102(a)(5) (Vernon 1968), but rather a contract. *Federal Deposit Insurance Corporation v. Coleman,* 795 S.W.2d 706, 710 (Tex.1990). Additionally, the right of recourse arises only when the surety **pays** the debt. *Crimmins v. Lowry,* 691 S.W.2d 582, 585 (Tex.1985). The fact that the STANLEY GROUP would become liable and have to pay under their guaranties is only speculative and does not provide them with standing at this point.

Additionally, the facts of this case demonstrate that the guarantors explicitly waived impairment of collateral relief in their guaranty agreements.

■■■ It is also noted that the relief sought was for damages. This is not what is provided in the Texas Business & Commerce Code §§ 3.601 & 3.606 which provides for discharge on the instrument to the extent of the impairment of the collateral. The amount of damage to the collateral was not established at trial but rather that the collateral suffered damage. The jury award for damages not only was improper but the amount awarded was not supported by the evidence. The proper relief for this claim would have been for deficiency or set-off, not a damage award.

■ ESTOPPEL—The BANK asserts that the trial court's denial of the BANK'S motion for judgment and rendition of judgment based on the estoppel findings by the jury was erroneous. Estoppel was sought through a jury question stating that where there has been false representation or concealment of a material fact with the requisite intent, then the BANK should be estopped from recovery on the outstanding promissory notes.

The only false representation asserted at trial was the promise to extend a $500,000.00 line of credit. As found previously, there was no oral agreement to extend the credit due to lack of essential material elements to make an oral agreement binding. Additionally, as established above, there was no evidence to support a finding of fraud in tort. The elements of fraud in tort must be present to support a finding for estoppel. There must have been a showing of detrimental reliance and there can be no detrimental reliance where a condition precedent has not been met. Under the facts of the instant case, the condition precedent was met after the offer to loan $500,000.00 had been extended, therefore there was no detrimental reliance. Estoppel was improperly submitted to the jury.

## THE BANK'S AFFIRMATIVE CLAIMS

The BANK asserts that the trial court erred in denying the BANK'S motion for judgment and in rendering a take-nothing judgment because the BANK is entitled to recover on its note and guaranty claims as a matter of law.

■ Where there is no genuine controversy and only one conclusion can be drawn regarding an issue, then it is unnecessary to submit an issue on that question. This is true even though issues may be controverted in the pleadings. *Commercial Insurance Company of Newark v. Smith*, 596 S.W.2d 661, 664 (Tex.Civ.App. —Fort Worth 1980, writ ref'd n.r.e.). If there is no conflict in the evidence, it need not be submitted to the jury. *Vineyard v. Harvey*, 231 S.W.2d 921, 924 (Tex.Civ.App. —Amarillo 1950, writ dism'd).

■ The facts and evidence clearly demonstrate that the corporation note in the amount of $236,377.61 and the security agreement secured by the equipment and other enumerated collateral were introduced at trial through Frank Bashore, BANK vice president, without objection, but rather agreement and stipulation as to the genuineness of the documents and signatures. Other documents entered into evidence through the same stipulation included the guaranties of Stanley, Harmel, Merrell and Ruby for a debt guarantee up to $300,000.00 each for T.O. STANLEY BOOT CO., INC., dated July 17, 1987. Also, the personal note for T.O. Stanley's promissory note in the amount of $36,208.42 dated January 22, 1988, was introduced with the same stipulation. The personal guaranties of Harmel and Merrell on Stanley's personal note were introduced. It was established that the notes were due and in default and demand letters had been sent.

The signed notes and the demand letters were introduced and uncontroverted as to amounts. Where the amount of the notes is undisputed and stipulated to, there is no jury question. Thus, the issue of the notes and guaranties has not been waived. Additionally, the elements of the notes were submitted in "reverse" through the jury questions on the defenses. In the absence of the defenses of usury, impairment of collateral, duress or estoppel, the notes are still legally binding, outstanding and in default.

## INTERLOCUTORY JUDGMENT AGAINST TYLER

The court, in its judgment, entered a take-nothing judgment regarding Tyler. In light of this Court's determination that there was no contract and the defenses against the promissory notes were faulty, the issue of the interlocutory default judgment does not need to be addressed. The reasoning is that ALL the Appellees are now, as a matter of law, liable on the respective notes due and guaranties to the BANK.

**292**

SUMMARY

As a matter of law, there was no oral agreement to lend the CORPORATION $500,000.00. Without a contract to detrimentally rely on, there can be no fraud in contract or tort. There is no cause of action under the DTPA because the Act applies to consumers in the purchase or lease of goods or services, and the Texas courts do not consider the "mere lending of money" to be a good or service within the meaning of the DTPA. Without a cause of action on the contract, or in fraud, or under the DTPA, there can be no basis for the damages sought by the Appellees. The defenses of usury and duress are faulty in that they depend on the finding of an oral agreement in order to negate liability on the undisputed promissory notes and guaranties. The action as to impairment of collateral was not available to the guarantors or the corporation. Without these claims and/or defenses, the BANK'S affirmative claims for recovery on the undisputed promissory notes should be granted. The court's entering a take-nothing judgment against the interlocutory default judgment on Tyler becomes a moot point.

Appellant's points asserting the trial court's error in denying its Motion for Judgment Non Obstante Veredicto and its Motion for New Trial and entering judgment for Appellees are sustained.

CONCLUSION

We reverse the judgment of the trial court and render judgment that the Appellees "take-nothing" against the Bank of El Paso, f/k/a Cielo Vista Bank.

We render judgment in favor of the BANK for: (1) the amount due under the notes and guaranties, including interest and attorney's fees as stipulated to; (2) foreclosure of the BANK'S collateral; (3) applicable prejudgment and post-judgment interest; and (4) court costs.

We remand the case to the trial court for entry of a judgment in favor of the BANK, consistent with this opinion.