Jessie Mae **WILLIAMS**

v.

**WAL–MART STORES, INC.,
and Rick Quinley.**

Civ.A. No. G–94–355.

United States District Court,
S.D. Texas,
Galveston Division.

April 11, 1995.

Herbert L. Hawkins, Jr., Bay City, TX, for plaintiff Jessie Mae Williams.

Alan N. Magenheim, Hirsch Robinson Sheiness & Glover, Houston, TX, for defendants Wal–Mart Corp., Rick Quinley.

## ORDER ON SUMMARY JUDGMENT

KENT, District Judge.

This is an employment discrimination suit in which Plaintiff Jessie Mae Williams ("Williams") alleges that Defendants Wal–Mart Stores, Inc. ("Wal–Mart") and Rick Quinely ("Quinley") have engaged in discriminatory behavior against her based on gender and race. Before the Court now is Defendants' Motion for Summary Judgment. For the reasons set forth below, the Court finds that Defendants' Motion should be **GRANTED IN PART** and **DENIED IN PART**.

### 1. Factual Background

Plaintiff Williams is a black female who began working in the Angleton, Texas branch of Wal–Mart in March, 1983. She was later transferred to the West Columbia, Texas location, and then was again relocated to the Lake Jackson, Texas store in 1985. From some point in 1986 to early in 1993, Williams was the Food Service Department Manager of the Lake Jackson Wal–Mart store.[1] In 1990, Defendant Rick Quinley, who is white, became the manager of the Lake Jackson store. Quinley later hired Jim Rutkowski, and instructed Williams to train him in the general procedures and departmental paperwork of the Food Department.

At some point early in 1993, Williams took a leave of absence from Wal–Mart in order to have surgery on her foot. During her leave, however, Wal–Mart closed its Lake Jackson store and replaced it with a new Wal–Mart "Supercenter." When she returned to work, Williams found that she was no longer a manager in the Supercenter, but was instead a "floater" who was moved from department to department. Plaintiff alleges that a white woman named Terry Bower assumed the position comparable to the store's Food Department Manager position at the Supercenter, namely, the Tobacco & Candy Manager.[2] Plaintiff further alleges that her hours were reduced from forty hours per week to ten hours per week by Defendant Quinley, and that she was denied merit raises that were

---

1. The Court notes that the parties' joint pre-trial order contains numerous discrepancies, one of which pertains to the length of Plaintiff's tenure as Food Department Manager. The Court admonishes the parties to scrutinize their pleadings with greater care before submitting them to this Court in the future.

2. The parties are unclear on this point, but it appears that the new Supercenter did not have a "Food Department" that directly corresponded to that found in the old store.

granted to white employees with similar performance ratings. Finally, Williams alleges that her working conditions were made so intolerable that she was forced to resign.

## 2. Standard of Review

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. A genuine issue of material fact exists if there is a genuine issue for trial that must be decided by the trier of fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In other words, summary judgment should not be granted if the evidence indicates that a reasonable factfinder could find in favor of the nonmoving party. *Id.* See also *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

In ruling on a Motion for Summary Judgment, the Court must accept the evidence of the nonmoving party and draw all justifiable inferences in his favor. Credibility determinations, the weighing of the evidence, and the drawing of reasonable inferences are left to the trier of fact. *Anderson v. Liberty Lobby*, 477 U.S. at 255, 106 S.Ct. at 2513–14.

Under Fed.R.Civ.P. 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Once this burden is met, the burden shifts to the nonmoving party to establish the existence of a genuine issue for trial. *Matsushita, supra,* 475 U.S. at 585–87, 106 S.Ct. at 1355–56; *Leonard v. Dixie Well Serv. & Supply, Inc.*, 828 F.2d 291, 294 (5th Cir.1987).

Where the moving party has met its Rule 56(c) burden, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.' Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party,

there is no *genuine issue for trial."* *Matsushita, supra,* 475 U.S. at 586–87, 106 S.Ct. at 1356 (quoting Fed.R.Civ.P. 56(e)).

## 3. Analysis

### 1. The Breach of Employment Contract Claim

Plaintiff Williams first alleges that her resignation from Wal–Mart constitutes constructive discharge and that Defendant has thus breached its employment contract with her. Plaintiff's claim is utterly without merit. It is elementary that in Texas employment is presumed to be at the will of the employer. *Sabine Pilot Service, Inc. v. Hauck,* 687 S.W.2d 733 (Tex.1985); see also *Zimmerman v. H.E. Butt Grocery Co.,* 937 F.2d 607, *cert. denied,* 502 U.S. 984, 112 S.Ct. 591, 116 L.Ed.2d 615 (1991). In order to overcome this presumption and survive a motion for summary judgment, a Plaintiff must demonstrate that a valid contract of employment exists. *Goodyear Tire and Rubber Co. v. Portilla,* 879 S.W.2d 47 (Tex.1994). Unfortunately for Plaintiff's case, however, Williams herself admitted in her deposition testimony that no such contract was ever made between her and the Defendant:

Q: Is there a policy manual or any kind of contract that you have that states that you're entitled to some additional pay raise in the event that you do a good job as opposed to a bad job?

A [Williams]: I didn't work under contract.

(Defendants' Motion for Summary Judgment, Instrument # 13, at 4).

Nevertheless, Plaintiff alleges that she did have an oral contract for permanent employment with Wal–Mart. (Plaintiff's Response, Instrument # 17, Exhibit A). Despite this conclusory allegation, however, there is no evidence or legal argument before the Court that suggests that such an oral contract was ever made or what its terms might have been. Plaintiff points in support of her allegation of an oral contract to the Wal–Mart employee handbook, which states: "To be successful and to continue employment at Wal–Mart, your performance must meet the Company's needs and the requirements of the job." This Court doubts that

Plaintiff—or Plaintiff's counsel—seriously intends this to be legitimate evidence of an *oral* contract. Indeed, it is not even sufficient evidence of a written contract. It is fundamental in this state that an employee manual "standing alone, may not expressly or impliedly limit an employer's ability to terminate an employee at will." *Glagola v. North Texas Municipal Water District*, 705 F.Supp. 1220, 1223 (E.D.Tex.1989):

> In order to alter the employment at-will rule, a plaintiff must rely on something more than an employee handbook; there must be evidence of an oral agreement specifically adopting the handbook as in [*United Transportation Union v. Brown*, 694 S.W.2d 630 (Tex.App.—Texarkana 1985, writ ref'd n.r.e.)], or a course of conduct on the part of the employer and employees treating the handbook as a contract. . . .

*Id.* In this case, there is no evidence whatsoever indicating that any oral understanding was present between Williams and Wal-Mart in this regard.

▇ Texas cases make clear that for an employment manual to alter the at-will relationship, it must "specifically and expressly limit[.] the relationship and curtail[ ] the employer's right to terminate the employee." *Almazan v. United Services Automobile Assoc., Inc.*, 840 S.W.2d 776, 780 (Tex.App.—San Antonio, 1992, writ denied). Unsigned handbooks are generally regarded as insufficient memoranda of an employment contract and may not satisfy the Statute of Frauds. *Molder v. Southwestern Bell Telephone Co.*, 665 S.W.2d 175 (Tex.App.—Houston [1st Dist.] 1983, writ ref'd n.r.e.). In particular, where there is no express agreement limiting the employer's right to unilaterally amend or withdraw the handbook, no modification of the employee's at-will status will be found. *Reynolds Manufacturing Co. v. Mendoza*, 644 S.W.2d 536, 539 (Tex.App.—Corpus Christi 1982, no writ). In this case, Plaintiff has provided this Court with no evidence at all as to whether the handbook was signed or unsigned or whether or not any express agreement limiting Wal-Mart's right to withdraw the handbook existed. As such, the Court finds that Defendants' Motion for Summary Judgment on Plaintiff's breach of an employment contract is **GRANTED,** and Plaintiff's cause of action on this matter is **DISMISSED WITH PREJUDICE.**

### 2. The Tortious Interference with Contractual Relations Claim

▇ Williams also alleges that Defendant Quinley willfully interfered with her employment contract with Wal-Mart. Obviously, to sustain this cause of action, Plaintiff must first establish the existence of a contract. *Hurlbut v. Gulf Atlantic Life Ins. Co.*, 749 S.W.2d 762, 767 (Tex.1987); *Spellman v. Lyons Petroleum, Inc.*, 709 S.W.2d 295, 298 (Tex.App.—Houston [14th Dist.] 1986, reh'g denied). Where no contractual liability for breach attaches, tort liability for interference typically does not attach. *Bank of El Paso v. T.O. Stanley Boot Co., Inc.*, 809 S.W.2d 279, 289 (Tex.App.–El Paso 1991). Thus, having already decided that Williams was an employee at will, the Court further finds that there can be no interference with an employment contract in this case and that Defendant's Motion for Summary Judgment on this issue is **GRANTED.** Consequently, Plaintiff's cause of action for this matter is **DISMISSED WITH PREJUDICE.**

### 3. The Equal Pay Act Claim

▇ Williams also alleges that Defendants discriminated against her in violation of the Equal Pay Act, 29 U.S.C. § 206(d). The Court finds Plaintiff's allegations under this statute to be absurd on their face. The Equal Pay Act holds, in part, that:

> No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the. opposite sex in such establishment. . . .

On its very face, this statute supports a claim with respect to gender discrimination only. *See Pearce v. Wichita County*, 590 F.2d 128, 133 (5th Cir.1979); *see also Hill v. J.C. Penney Co., Inc.*, 688 F.2d 370, 373 (5th Cir. 1982).

Williams' sole allegation in this regard is that she was denied merit raises she believes she should have received sometime around 1992; she is *not* claiming that her non-merit based pay was less than that given to men:

Q: [Y]ou've been getting pay raises, right?

A: Annually. ·

Q: Right. And you haven't been denied any benefits, right? You have received all of the benefits you were entitled to, right?

A: Right.

Q: So, in what way were you damaged up to this point?

A: I didn't get my raise that I thought I was supposed to have, my merit raise; and the reason I didn't get it was because I don't think that Quinley didn't think that I deserved it because I was black. That's what I think.

(Defendants' Motion for Summary Judgment, at 19). As this colloquy makes clear, however, Williams claims that she was denied merit raises because she is black, not because she is a woman. In fact, Williams admits in her own motion that white females received the merit raises she claims were denied to her. (See Plaintiff's Response, at 3). Consequently, the Court finds that Plaintiff has not stated a valid cause of action under the Equal Pay Act. Defendants' Motion for Summary Judgment is **GRANTED** on this point, and Plaintiff's cause of action under this statute is hereby **DISMISSED WITH PREJUDICE.**

*4. The Denial of ERISA Benefits Claim*

■ Plaintiff also claims that Defendants violated her rights under ERISA, 29 U.S.C. § 1140, by cutting her hours and constructively discharging her.[3] In order to prevail on such a claim, Plaintiff must show that Defendants acted with a specific, discriminatory intent to deny her benefits. *Clark v. Resistoflex Co.*, 854 F.2d 762, 770 (5th Cir. 1988). The Court finds that Plaintiff has utterly failed to demonstrate the existence of such an intent.

The Fifth Circuit has been very clear in this context that:

A party against whom summary judgment is ordered cannot raise a fact issue simply by stating a cause of action where defendants' state of mind is a material element ... "There must be some indication that he can produce the requisite quantum of evidence to enable him to reach the jury with his claim."

*McGann v. H & H Music Co.*, 946 F.2d 401, 408 (5th Cir.1991), *cert. denied*, —— U.S. ——, 113 S.Ct. 482, 121 L.Ed.2d 387 (1992) (quoting *Hahn v. Sargent*, 523 F.2d 461, 468 (1st Cir.1975), *cert. denied*, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976)). In *McGann*, the Plaintiff notified his ERISA-governed medical plan that he had AIDS. Six months later the plan administrator reduced Plaintiff's maximum benefits from $1,000,000 to $5,000. The Circuit upheld summary judgment against the Plaintiff, stating that even if the plan administrator changed the terms of the plan in response to McGann's illness, the change affected all employees generally and was not specifically designed to deny him particular medical benefits "in effect." *McGann*, 946 F.2d at 404.

In this case, the Court finds that evidence of general intent, much less specific intent, to deny Williams ERISA-governed benefits is far weaker than it was even in *McGann*. It is clear that employees who worked fewer than twenty-eight hours per week automatically lost the right to benefits and that Plaintiff's work· hours were reduced below this critical level. Nevertheless, there is no evidence before the Court suggesting that Wal-Mart ever acted with the requisite specific intent.

In his affidavit, Rick Quinley denies ever intending to deprive Plaintiff of her ERISA benefits. (See Defendants' Motion for Summary Judgment, Exhibit A). Moreover, a copy of the Plaintiff's performance coaching record of September 17, 1993, clearly documents that her schedule was reduced from

---

**3.** The benefits protected by the ERISA statute include "medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other train-

ing programs, or day care centers, scholarship funds, or prepaid legal services." 29 U.S.C. § 1002(1); *see also Memorial Hospital System v. Northbrook Life Ins. Co.*, 904 F.2d 236, 240 (5th Cir.1990).

thirty-four to eighteen hours per week as a direct result of her inability to work evenings or Saturdays. (Id.). According to the record, Williams stated that she had babysitting problems, and her supervisor noted that even though she was offered more hours, Williams turned them down and notified the store that she could no longer begin her morning shift at seven o'clock in the morning, but would have to begin at eight o'clock instead. Therefore, in the absence of any evidence at all that Defendants had an intent—general or specific—to deny Plaintiff ERISA benefits, the Court finds that Defendants' Motion for Summary Judgment is **GRANTED** on this issue and that Plaintiff's claims under ERISA are **DISMISSED WITH PREJUDICE.**

### 5. The Title VII Claim

Finally, Plaintiff claims that Defendants have violated Title VII on the bases of both race and gender by failing to give her merit raises, by demoting her from Food Department Manager to "floater," and by reducing her hours to ten per week.

■■■ Section 703(a)(1) of Title VII of the Civil Rights Act of 1964 provides in relevant part:

It shall be an unlawful employment practice for an employer to ... discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e–2(a)(1).

A Title VII retaliation claim requires *intentional* discrimination, and under the familiar *McDonnell Douglas/Burdine* framework, the Court employs a three-part test designed to determine the motivation of the defendant in taking the challenged action. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 255 n. 10, 101 S.Ct. 1089, 1095 n. 10, 67 L.Ed.2d 207 (1981). First, the plaintiff is required to establish a prima facie case wherein she must establish the elements of the discrimination claim. If the plaintiff meets these requirements, a presumption of discrimination arises. *Bodenheimer v. PPG*

*Industries, Inc.,* 5 F.3d 955 (5th Cir.1993). In order to establish a prima facie case, Plaintiff must show that:

(1) she belongs to a protected class;

(2) she was qualified to do her job;

(3) despite her qualifications, her employment situation was adversely affected; and

(4) her position was filled by, or the benefits or promotions she sought were given to, someone outside that protected class.

*McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824.

■■■ Second, the defendant may then rebut this presumption by articulating a legitimate, nondiscriminatory reason for the alleged discriminatory action. *Olitsky v. Spencer Gifts, Inc.,* 964 F.2d 1471 (5th Cir. 1992). An employer meets this burden by proffering admissible evidence of an explanation that would be legally sufficient to justify a judgment for the employer. *Guthrie v. Tifco Indus.,* 941 F.2d 374, 376 (5th Cir. 1991). The defendant need not *persuade* the trier of fact that there was no intentional discrimination; he need only produce evidence on that point. *St. Mary's Honor Center v. Hicks,* —— U.S. ——, ——, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407, 416 (1993).

■■■ Third, once the employer satisfies this burden, the presumption of discrimination established by the employee's prima facie case dissolves. *Burdine, supra,* 450 U.S. at 255 n. 10, 101 S.Ct. at 1095 n. 10. The employee's burden of persuasion then arises, and the plaintiff must produce evidence that the employer's proffered reasons are mere pretexts, the real reason for the action having been based on an impermissible animus. *Id.* at 256, 101 S.Ct. at 1095; *Bodenheimer, supra,* 5 F.3d at 959.

■■■ In this case, Plaintiff's allegations of wrongful discrimination can be distilled to essentially three claims: Defendants denied her merit raises; Defendants reassigned her position to a white female employee while Plaintiff was recuperating from foot surgery and demoted Plaintiff upon her return to work; and Defendants reduced her hours, thereby constructively discharging her.

Frankly, the Court finds Plaintiff's merit raise claim to be a close issue for summary judgment purposes. Encompassed in Plaintiff's claim that she was denied merit raises illegally are her claims that she was given negative performance reviews (or punished for minor infractions for which whites were not punished) on the basis of race. In her affidavit, Plaintiff proclaims that Quinley is a "deceitful, devious and mean racist" whose discriminatory actions "were well known by others." (Plaintiff's Response, Williams Affidavit). In an attempt to support her assertion, Plaintiff claims to have witnesses "who can testify regarding Mr. Quinley's conduct," and claims to have described specifically the nature of his conduct in her deposition testimony, which she incorporates into her response.

Defendants maintain that Plaintiff has failed to demonstrate that she did not receive merit raises because of her race or sex and refer to examples in Plaintiff's deposition testimony to illustrate their point. Defendants cite deposition excerpts in which Plaintiff admits that she had no idea why Quinley did not give her a raise despite the fact that her supervisor had given her a positive evaluation with which Quinley had agreed. Later, during her deposition, Defendants admit that Plaintiff suggested the existence of a discriminatory reason behind the merit raises. However, Defendants point out that Plaintiff conceded as well that other blacks employed at the store also received "raises and merits." As Defendants observe, this evidence fails to support Plaintiff's claim of race-based discrimination. Moreover, Defendants offer a legitimate, non-discriminatory reason for their denial of Plaintiff's merit raise: though Plaintiff's work was satisfactory for the most part, Williams did nothing to warrant a raise beyond the annual raises she admits she received.

In response, Plaintiff points to an evaluation given to her by her supervisor that indicates that she had been recommended for a merit raise and that Quinley turned her down in spite of this recommendation. Plaintiff insists that she "got good evaluations and reports," and that she "had good attendance" and "performed [her] job well." (Plaintiff's Response, Williams Affidavit). The Court notes that in a performance review dated February 26, 1993, Plaintiff's performance was indeed rated adequate or above average in all aspects. (See Plaintiff's Response, Performance Rating). While her supervisor noted that her attendance had been poor "due to illness and dental problems, he noted that "[o]ther than these absences, Jessie's attendance ha[d] been above average." Moreover, the supervisor noted that Williams' [f]ollow through on instructions [was] good" and that she was "good with customers and other assistants." (Id.). The personnel report indicates that, notwithstanding the positive evaluation, Plaintiff's rate of pay did not change after the review, but remained at eight dollars per hour.

In support of her allegation of racism, Williams cites the affidavit testimony of her Wal–Mart colleague Irene Moreno, who states that "Quinley and other white supervisors had a pattern and practice of treating Hispanic and black employees differently than whites." According to Moreno, racial minorities were disciplined, reprimanded, or criticized for minor infractions. (Plaintiff's Response, Moreno Affidavit). The Court finds that Moreno's statement that blacks were sanctioned for infractions for which whites were not does support Williams' claim. Moreover, Plaintiff's average and above-average ratings, as well as her claim that she resolved some of her department's financial difficulties, also constitute some evidence that Defendants' claim that Plaintiff did not deserve a merit raise is false. Although the Court is distinctly underwhelmed by Plaintiff's evidence in this regard, the Court must indulge every possibility in favor of the non-movant. Having done so, the Court finds that Plaintiff has offered the minimum evidence required to survive Defendants' Motion for Summary Judgment on this point.

Related to Plaintiff's wrongful demotion claim are her claims that she was not allowed to apply for higher paying positions for which white employees were allowed to apply once the Supercenter opened. Defendants counter that Plaintiff was *not* demoted and point out that her pay was not reduced, although her job title was changed. Plaintiff re-

sponds, however, that "floaters" held a lower position in the store hierarchy and that they must report to their respective department managers rather than to an assistant manager.

Defendants assert that they had a legitimate, non-discriminatory reason for their actions on several grounds. First, they argue that Williams was denied the managerial position at the Supercenter because she was on medical leave having foot surgery and was thus simply not available for the position at the time it opened. Secondly, Defendants argue that the Supercenter's co-manager believed Plaintiff's job performance had been poor during her work at the Lake Jackson Wal–Mart. Plaintiff's personnel records confirm that her supervisor was dissatisfied with some aspects of Plaintiff's job performance. A personnel record entry dated January 22, 1993, for example, indicates that her performance needed improvement with respect to productivity, inventory control, and merchandising. Finally, Defendants claim that their action toward Williams was motivated by personal, not racial, reasons.

In response, Plaintiff points to her February 26, 1993, review mentioned above that shows that she was rated adequate or above average in all aspects. In addition, Williams claims that her replacement as the manager of the Tobacco & Candy Manager at the Supercenter—a white female—had fewer years of experience, lesser qualifications than the Plaintiff, and experience as a food department manager. By contrast, Williams claims to have had over ten years experience with Wal–Mart, eight of which were spent as a department manager. (Plaintiff's Response, Williams Affidavit). Plaintiff also points out that Defendants had approved of her medical leave and that she had been told by them that she would be the new Food Manager when she returned to work. According to Plaintiff, white employees were allowed to remain in the same positions that they held prior to the Supercenter's opening, and whites who were out on medical leave did not lose their jobs on returning to the Supercenter. Finally, Plaintiff asserts that while about five black employees held positions as department managers when Quinley

came to the Lake Jackson store, only one black department manager remained at the time he was transferred. According to Plaintiff, Quinley had demoted the others.

Moreover, Plaintiff states that while several black women were allowed to retain their managerial positions when the Supercenter opened, those women were demoted approximately one to two months after the store's conversion. (Plaintiff's Response, Williams Deposition). The only such woman whom Plaintiff could name was Nettie Bivens. When asked whether other factors could have influenced the decision to demote Bivens to a "floater" position, Plaintiff denied this possibility.

Based on this presentation by the parties, the Court finds that Plaintiff has come forward with sufficient evidence to withstand Defendants' Motion for Summary Judgment with respect to her claim that Defendants' decision was based on racial considerations. Plaintiff's evidence tends to show that her performance evaluation was good in February, 1993, and that her qualifications surpassed those of Ms. Bowers. Moreover, Plaintiff's evidence suggests that Defendants demoted a disproportionate number of black managers, while allowing whites to remain in, or to attain, managerial positions.

Having decided that Plaintiff has provided sufficient evidence to survive a summary judgment against her on the Title VII claim, the Court need not reach every possible aspect of that claim. Indeed, as the Court stated in its earlier Order of Dismissal, Plaintiff's pleadings in this case verge on the utterly incomprehensible, and the Court finds it something of a matter of conjecture to outline in a precise manner every possible Title VII offense stated by Plaintiff. Thus, the Court does not reach at this time the specific merits of Plaintiff's implicit Title VII claim of reduction in work hours and finds that Defendants' Motion for Summary Judgment against Plaintiff's cause of action under Title VII is **DENIED**.

Before leaving this matter, however, the Court would like to urge the parties in this case to seriously consider settling the remaining Title VII claim. The Court observes that Plaintiff has a weak case, and given that

only the Title VII claim remains, Defendant Quinley is obviously no longer liable under the applicable law. On the other hand, the very fact that the Court has denied Defendants' Motion for Summary Judgment on the Title VII claim suggests that a rational juror *could* find in Plaintiff's favor, and Defendant Wal–Mart must face the cost of litigation, the possibility of losing at trial, and the cost of appeal.

For the reasons stated above, the Court finds that Defendants' Motion for Summary Judgment is **DENIED** insofar as it seeks to dismiss Plaintiff's Title VII claim. The Motion is **GRANTED** insofar as it objects to Plaintiff's claims of breach of employment contract, tortious interference with contractual relations, interference with ERISA benefits, and the Equal Pay Act, and each of these causes of actions is hereby **DISMISSED WITH PREJUDICE.** Each party is to bear his or its own taxable costs. It is further **ORDERED** that the parties file no further pleadings on this matter, including motions to reconsider and the like. Instead, the parties are instructed to seek whatever relief they feel themselves entitled in the United States Court of Appeals for the Fifth Circuit, as may be appropriate in due course.

IT IS SO ORDERED.